**WRIGHT et al. v. MT. MANSFIELD LIFT, Inc., et al.**

**Civ. A. No. 1101.**

United States District Court
D. Vermont.
April 16, 1951.

Justin G. Cavanaugh and William H. Cooney, Springfield, Mass., for plaintiffs Florine Wright and Robert B. Wright, Jr.

McNamara & Larrow, Burlington, Vt., Frank G. Sterritte, New York City, for defendants Mt. Mansfield Lift, Inc. and Mt. Mansfield Hotel, Inc.

Clifton G. Parker, Morrisville, Vt., for defendant Stowe-Mansfield Ass'n, Inc.

GIBSON, District Judge.

This is an action for damages resulting from a skiing accident brought by Florine and Robert B. Wright, Jr., husband and wife, of Springfield, Mass., against the Mt. Mansfield Lift, Inc., Mt. Mansfield Hotel, Inc., and the Stowe-Mansfield Association, Inc. The case was heard on its merits at the February term, 1951, U. S. District Court, District of Vermont. At the conclusion of the plaintiff's case, each of the three defendants filed a motion for a directed verdict. The motion, in each instance, is hereby granted.

The plaintiff, Mrs. Florine Wright, in her complaint, alleged that on January 23, 1949, she was skiing at the Mt. Mansfield ski area in Stowe, Vermont; that she had paid the required fee to one of the defendants, Mt. Mansfield Lift, Inc., hereinafter called Lift; had been transported to the top of Mt. Mansfield by this chair lift and having reached the top, started to ski down a marked trail; that on her way down the mountain, at a certain point on a ski trail, she ran against or collided with a snow-covered stump of a tree and thereby caused a serious fracture of her left leg.

The evidence viewed in the light most favorable to the plaintiff revealed the following situation. Stowe, Vermont, has become one of the largest winter sports areas of the eastern United States. The area of

Mt. Mansfield is a snow bowl. In fact, the slogan of the area is "There is always snow in Stowe, you know".

Lift, Inc. was a Vermont corporation which owned or controlled land running up Mt. Mansfield on which it had erected a modern chair lift for skiers, the lift itself being better than a mile long.

In January, 1949, those who desired to ski down the trails of Mt. Mansfield in this area purchased a ticket at the bottom of the mountain where the lift commenced, the ticket costing 75¢ for a single ride up the mountain. After purchasing the ticket, the prospective skier stood in line and as the skier's turn came, sat in the ski chair, generally with skis on. The skier was then hoisted better than 2,000 feet above the elevation of the bottom of the ski lift and deposited at the top of the ski lift at the top of Mt. Mansfield. At the top of the ski lift, there was what is known as the Octagon House, made of stone, in which was served refreshments and also in which was a blackboard or chart on which were listed the particular trails which were open for skiing. There were also located in this general area at the top of the lift signs pointing to the starting points of various trails down the mountain, each trail bearing a different name, such as Nosedive, Skimeister, Toll Road, etc. Most of these trails started on land that was owned or controlled by Lift, Inc. As these trails wended their way down Mt. Mansfield, they twisted their way, on occasion, onto lands owned or controlled by others. Defendant Mt. Mansfield Hotel, Inc., hereinafter called Hotel, Inc., at the time of the accident, owned and operated a hotel which at that time cared for approximately 20 guests. Most of these guests were ski enthusiasts. The Skimeister trail, as it came down Mt. Mansfield, came onto land of the Hotel, Inc. The Skimeister trail had been in operation for many years before this accident with the full knowledge and approval of Hotel, Inc. The trails were areas cleared down the rough mountain side of Mt. Mansfield by cutting trees, by bulldozing and by other methods. The trails are of varying width, some trails being much more crooked than others.

The maintenance of the trails in the summertime consisted of mowing and cutting the brush and trees and of widening existing trails. Various residents, interested innkeepers in and about Stowe, men from the Forestry Department of the State of Vermont and workers provided by Lift, Inc., Hotel, Inc., and other organizations interested in skiing, did the summer maintenance work on these trails.

Generally speaking, there were three classes of trails on Mt. Mansfield which those who used the ski lift might choose. There was one class of trails known as expert trails. To maneuver these trails required a high degree of skiing ability. The second class of trails were known as the intermediate trails. These trails were less hazardous and less difficult than the expert trails, but one to negotiate them safely needed to be a fairly good skier. The third class of trails were known as the novice trails. These trails were for those who had skied but little.

During the winter of 1948–1949, the policing of the trails was done by an association known as the Mt. Mansfield Ski Patrol. This ski patrol consisted of five or six good skiers who were paid by the Mt. Mansfield Ski Club. This club, in turn, raised its funds by contributions from individuals, corporations, innkeepers and the like. Its total budget for the winter season of 1948–1949 was in the vicinity of $3,000. Of this, about $1,000 was contributed by the Hotel, Inc. and another substantial sum by the Lift, Inc.

The duties of this Ski Patrol were many. It was the Patrol's duty each day to inspect each trail to determine which trails were suitable for skiing and which were not. Having done this, the patrol would see to it that the blackboard in the Octagon House which listed the trails open for skiing would properly list those that were open for skiing on this particular day. The patrol would also see to it that such trails as were adjudged by it as unsafe for skiing were closed off by chain or rope and that warning signs were put up at the start of the trail and at other places warning that this particular trail was not open. In addition, members of the patrol skied down the trails

and kept their eyes open for any unsafe conditions that appeared on open trails. If there were any, patrol members took steps to put up proper warning flags or proper safeguards or notified officials of the lift that there was a dangerous spot at a certain place on a certain trail so that steps would be taken immediately either to erect proper warning notices or to close off the trail.

The main purpose of the members of the ski patrol was to be available in case of any injury to any skier. Ski patrol members were trained in first aid and had equipment staged at various places on Mt. Mansfield for the purpose of removing injured skiers safely and expeditiously to the bottom of the mountain and if necessary to a hospital.

On January 23, 1949, Mr. and Mrs. Wright, accompanied by Mr. Abrams, went from Fayston, Vermont, where the Wrights were both working at this time, to Stowe, Vermont, for skiing purposes. Mr. Wright was an expert skier, having been certified as such, and was engaged as a ski instructor at the Mad River Valley ski project. Mrs. Wright had been skiing for 2–3 years and had taken lessons from her husband and others. She was not what is known as an expert skier, but was in what is generally termed as the intermediate ski class. Mr. Abrams was not as good a skier as Mr. and Mrs. Wright, but was generally able to negotiate intermediate trails.

On the day in question, this party arrived at the foot of Mt. Mansfield around noon. Mrs. Wright and Mr. Abrams purchased a ticket for 75¢ apiece to ride to the top of Mt. Mansfield on the ski lift. Mr. Wright being a professional was not required to buy a ticket. This was a courtesy extended by the lift to professional skiers. In due time, the party arrived at the top of Mt. Mansfield via the lift. Mr. Wright checked to see what trails were open and the group then went to the start of the Toll Road trail. The Toll Road trail down Mt. Mansfield is a gravelled road used by automobiles during the summertime. It is about four miles in length and one who goes down the Toll Road all the way, comes out at a point about two miles from the bottom of the lift and to get back to the lift, has to either walk or go by taxi. This Toll Road is classified as a novice trail. The party skied down the Toll Road until they came to a cut-off from the Toll Road, known as the 5th Avenue Cut-off. The party then turned onto this cut-off and skied down the cut-off until they arrived at the Skimeister trail. They then swung down the Skimeister trail until they came to the head of an open slope known as the T-bar slope, thence down that slope to the foot of the mountain. In coming down the mountain, Mr. Wright would lead the way, followed by Mrs. Wright and then followed in turn by Mr. Abrams. They would ski a distance of 200–300 feet, more or less, then stop and visit and then after resting a little, Mr. Wright would start off again followed in due time by Mrs. Wright and Mr. Abrams. Mr. Wright would ski as far as he thought wise on a given lap, stop and Mrs. Wright would come up behind him, stop, and Mr. Abrams the same. The first trip down these trails on Mt. Mansfield was uneventful. The party then got back onto the lift, again Mrs. Wright and Mr. Abrams purchasing tickets for 75¢ and were conveyed to the top of Mt. Mansfield once more. The three of them started once again down the identical route they had taken on the first descent; down the Toll Road to the 5th Avenue Cut-off, down the 5th Avenue Cut-off to the Skimeister trail, down the Skimeister trail to the top of the T-bar and the open slopes. The 5th Avenue Cut-off is just what the name implies, a cut-off from the Toll Road trail to another trail. It was an easy trail, a novice trail. The Skimeister trail, on the other hand, was an intermediate trail. The second trip down the mountain by this party was uneventful until the party came onto the Skimeister trail. There, a couple of hundred feet from where the Skimeister trail ran into the open slope and the T-bar lift, the party stopped for a rest and visit. Then Mr. Wright, as was the procedure on this particular day, skied down about 120

790

feet or so to within sight of the head of the T-bar lift, and also within sight of the hut called the Christienda hut, which is located near the top of the T-bar lift. He stopped and turned around and watched his wife come along. As Mrs. Wright began to approach him, she went into what is known as a snow-plow. This is a procedure used by skiers for stopping. It consists of turning the toes in to about an angle of 30° each and putting more pressure on the inside runner of each ski. As she was snow-plowing to a stop, she suddenly fell and began to cry out in pain for help. Mr. Abrams, in the meantime, was standing at the spot they last stopped. He then skied to the spot where Mrs. Wright had fallen. Mr. Wright rushed up from a spot 15–20 feet away. Shortly a member of the ski patrol arrived with a toboggan. Mrs. Wright was in pain and was loaded onto the toboggan, tied onto the toboggan and thus taken down to the foot of the mountain and thence by automobile to the Morrisville Hospital.

The trail at the point of the accident was of good width and was more or less level land. It wasn't hazardous or steep in any way at this spot. No stump showed above the snow. There was a smooth snow surface. Indeed the Skimeister trail had ample snow. The witness Abrams testified that at the point of the plaintiff's fall, he got down and brushed the snow aside with his hand. He then found a stump 4–5 inches high from the ground— definitely a cut tree—no jagged edges. From the evidence one could infer that it was this obstacle that caused Mrs. Wright to fall and break her left leg.

From this recitation of the facts, as viewed in the light most favorable to the plaintiffs, it is apparent that there is no evidence of any nature that connects the defendant, Stowe-Mansfield Association, Inc., with this case. Stowe-Mansfield Association, Inc. neither owned or controlled any of the land on which this accident happened. It was merely a promotional enterprise for the Stowe-Mansfield area. Indeed, the plaintiffs make no claim, that as the evidence stands, there is liability

upon Stowe-Mansfield Association, Inc. Therefore, a directed verdict on this defendant's part is granted.

The situation is different, however, in regard to the Lift Company and the Hotel Company.

■ In the eyes of the law, the plaintiffs were invitees of the Lift and Hotel Companies. Whenever one makes such use of another's premises as the owner intends he shall, or such as he is reasonably justified in understanding that the owner intended, this is an implied invitation to enter onto the land of another. Wool v. Larner, 112 Vt. 431, 436, 26 A.2d 89.

The Lift Company invited the plaintiffs to the top of the lift. It maintained on its premises a record as to which trails were open and had signs on its property for the purpose of leading the plaintiffs to their choice of trail, in this case the Toll Road Trail. Once on the trail and heading down the mountain, the plaintiffs were invited onto the Skimeister Trail, part of which was on land of the Hotel Company. This trail the Hotel Company had sanctioned for years. Indeed, the reason for each of the trails mentioned being open was to financially benefit both the Lift Company and the Hotel Company.

■ The duty owed the plaintiffs, invitees, by each of these two defendants was to advise them of any dangers which reasonable prudence would have foreseen and corrected. Slattery v. Marra Bros., 2 Cir., 186 F.2d 134, 136.

Skiing is a sport; a sport that entices thousands of people; a sport that requires an ability on the part of the skier to handle himself or herself under various circumstances of grade, boundary, mid-trail obstructions, corners and varied conditions of the snow. Secondly, it requires good judgment on the part of the skier and recognition of the existing circumstances and conditions. Only the skier knows his own ability to cope with a certain piece of trail. Snow, ranging from powder to ice, can be of infinite kinds. Breakable crust may be encountered where soft snow is expected. Roots and rocks may be hid-

den under a thin cover. A single thin stubble of cut brush can trip a skier in the middle of a turn. Sticky snow may follow a fast running surface without warning. Skiing conditions may change quickly. What was, a short time before, a perfect surface with a soft cover on all bumps may fairly rapidly become filled with ruts, worn spots and other manner of skier created hazards.

The doctrine of volenti non fit injuria applies. One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary. Thus one who goes ice skating on a rink assumes the ordinary risks of the sport which includes inequalities of surface. Oberheim v. Pennsylvania Sports and Enterprises. 358 Pa. 62, 55 A.2d 766, 769; Shields v. Van-Kelton Amusement Corp., 228 N.Y. 396, 127 N.E. 261; McCullough v. Omaha Coliseum Corp., 144 Neb. 92, 12 N.W.2d 639, 643. One who goes to a swimming beach as an invitee accepts the dangers that inhere in it so far as they are obvious and necessary. McGraw v. District of Columbia, 3 App.D.C. 405, 25 L.R.A. 691, 692–693. A passenger who rides on a scenic railway and falls off, through no unusual action of the railway, may not recover. The passenger has placed himself in a position of obvious danger for the purpose of receiving the sensation caused by the sudden and violent motion of the car. He assumed the risk. Lumsden v. L. A. Thompson Scenic Railway Company, 130 App.Div. 209, 114 N.Y.S. 421, 423. One who had participated in bobsledding and had followed that sport for some years assumes the risk attendant upon participation of that sport. The bobsled enthusiast knew that bobsled racing was a dangerous sport and could not recover for injuries received. Clark v. State, 195 Misc. 581, 89 N.Y.S.2d 132, 139.

In this skiing case, there is no evidence of any dangers existing which reasonable prudence on the parts of the defendants would have foreseen and corrected. It isn't as though a tractor was parked on a ski trail around a corner or bend without warning to skiers coming down. It isn't as though on a trail that was open work was in progress of which the skier was unwarned. It isn't as though a telephone wire had fallen across the ski trail of which the defendant knew or ought to have known and the plaintiff did not know.

The trail at the point of the accident was smooth and covered with snow. There were no unexpected obstructions showing. The plaintiff, in hitting the snow-covered stump as she claims to have hit, was merely accepting a danger that inheres in the sport of skiing. To hold that the terrain of a ski trail down a mighty mountain, with fluctuation in weather and snow conditions that constantly change its appearance and slipperiness, should be kept level and smooth, free from holes or depressions, equally safe for the adult or the child, would be to demand the impossible. It cannot be that there is any duty imposed on the owner and operator of a ski slope that charges it with the knowledge of these mutations of nature and requires it to warn the public against such. Chief Justice Cardozo in the case of Murphy v. Steeplechase Amusement Co., Inc., 250 N.Y. 479, 166 N.E. 173, 174, discusses the law, which I hold to be applicable to ski accident cases and I quote:

"Volenti non fit injuria. One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary, just as a fencer accepts the risk of a thrust by his antagonist or a spectator at a ball game the chance of contact with the ball. * * * The antics of the clown are not the paces of the cloistered cleric. The rough and boisterous joke, the horseplay of the crowd, evokes its own guffaws, but they are not the pleasures of tranquillity. The plaintiff was not seeking a retreat for meditation. Visitors were tumbling about the belt to the merriment of onlookers when he made his choice to join them. He took the chance of a like fate, with whatever damage to his body might ensue from such a fall. The timorous may stay at home.

"A different case would be here if the dangers inherent in the sport were obscure or unobserved. * * * Nothing happened to the plaintiff except what common

experience tells us may happen at any time as the consequence of a sudden fall. Many a skater or a horseman can rehearse a tale of equal woe."

The verdict is therefore directed for each defendant.