**Barbara B. LEOPOLD, as Executrix of the Estate of Thomas L. Nelson, Deceased**

v.

**OKEMO MOUNTAIN, INC.**

**Civ. A. No. 74–48.**

United States District Court, D. Vermont.

Sept. 17, 1976.

---

Douglas Meystre and John Hodgson, Fletcher, Tilton & Whipple, Worcester, Mass., and Alan Overton, Kolvoord, Overton & Wilson, Essex Junction, Vt., for plaintiff.

Karen McAndrew and Frederic W. Allen, Dinse, Allen & Erdmann, Burlington, Vt., and Melvin Fink, Glover & Fink, Ludlow, Vt., for defendant.

COFFRIN, District Judge.

This wrongful death action arises from a ski accident which occurred at Okemo Mountain Ski Area in Ludlow, Vermont, on February 20, 1972 and resulted in the death of Thomas L. Nelson. Barbara B. Leopold, the plaintiff, is the executrix of the decedent's estate, and at the time of the ski accident, was his wife. Mrs. Leopold is now remarried and residing in California. The defendant, Okemo Mountain, Inc., is a Vermont corporation. From the testimony and exhibits introduced at trial in Burlington, the Court finds the following pertinent facts:

Thomas Nelson was, by all accounts, a skilled and experienced downhill skier, aged 42 years, when the accident occurred. He had skied extensively during his younger years and had been a member of his preparatory school ski team. His involvement in the sport lapsed for a period of about 9 years following his marriage to the plaintiff in 1955, but resumed again after that time. Skiing also became an important part of the Nelson family's recreational life. The two children, Rett and Carolyn, now ages 17 and 14, learned to ski at early ages, and joined their parents on frequent ski trips thereafter. The family usually spent at least three "long" winter weekends a year skiing at resort areas in the southern part of Vermont and one full vacation week skiing at an area in northern Vermont. Mr. Nelson and the plaintiff also took a number of "day trips" each year, skiing in Vermont alone or with friends. In all, Mr. Nelson skied about 20–28 days each year in the 8 years preceding his death. Despite an awkward style, he was considered to be the most competent skier in the family. Though cautious, he could comfortably negotiate any ski trail he encountered, including those rated as "expert" trails.

On Friday, February 18, 1972, the Nelson family and R. Lavinia Bennett, a family friend, drove from the Nelson's home in Holden, Massachusetts, to Chester, Vermont, where they planned to stay at the Chester Inn for the three-day, Washington's Birthday weekend. On Saturday, February 19, the Nelsons and Miss Bennett skied at nearby Bromley Ski Area, where they found excellent skiing. They returned in the late afternoon to the Chester Inn, where they had dinner and an after-dinner walk in freshly fallen snow.

The Nelsons awoke at eight or eight-thirty on Sunday, February 20, 1972, and had breakfast at the Inn. The weather was fairly sunny, and though cold and windy, it was no colder than on many other occasions when the family had skied. The party decided to ski at Okemo that day, because unlike the other nearby ski areas, it had several surface Poma lifts to carry skiers to the top of the mountain. Unlike a chair lift, which often stands above the trees, exposing its riders to a cold wind, a Poma lift does not take its riders off the ground, and may be a more comfortable means of transportation on a cold day. The family also thought the wind was strong enough to require the closing of the chair lifts for the day, and Okemo's Poma lifts assured the party a way to get to the top of the mountain.

The Nelsons and Miss Bennett arrived at Okemo at approximately 9:45, and after a stop inside the base lodge to put on ski boots and other equipment, went outside and purchased lift tickets. They looked at a sign where the defendant posted a daily report of skiing conditions on the mountain's various trails, but did not look at the trail maps which the mountain company made available to skiers. The Nelsons were familiar with the trails at Okemo, however, having skied there previously and having seen a trail map on prior occasions. The trail maps provided by the defendant showed the location of all the trails and lifts on the mountain, and indicated by color coding and symbols the degree of difficulty of each trail. All trails on the mountain but one were open on February 20, 1972, and an all-day lift ticket entitled the Nelsons to choose any open trail to ski.

After purchasing lift tickets, the Nelsons and Miss Bennett rode one of the Poma lifts halfway up the mountain, changed lifts and rode another Poma to the top. The weath-

er on top was still windy and bitter cold. It was, by then, a cloudy day with "patches of sun," but the visibility was good. It was not snowing.

Without much discussion, the group proceeded to their left after leaving the lift, and began skiing down the trail known as the "Quiver." The Quiver trail at Okemo is an "expert" or "most difficult" trail, and is quite steep and narrow. On February 20, 1972, it also had many "moguls," or small snow-hills. Nevertheless, the skiing was excellent, and although some members of the group were not entirely accustomed to the "powder" skiing conditions, with 8½ inches or so of soft, new snow, no one had any difficulty with the trail or the skiing conditions. Mrs. Nelson, however, had some trouble adjusting her ski boots properly, and she stopped several times in an effort to get the proper adjustment.

After skiing some distance down the Quiver, the group stopped and assembled at the side of the trail. The exact location of the stop was the subject of some disagreement at trial, but is unimportant. The purpose of the stop was another attempt by Mrs. Nelson to adjust her boots. After fixing her boots momentarily, Mrs. Nelson suggested that the others go ahead. The children started first, followed by Miss Bennett. Mrs. Nelson then suggested to her husband that he ski ahead of her and turn to watch her ski, so that he could comment on her "form." Mr. Nelson then skied down the hill out of Mrs. Nelson's sight. When she next saw him, the accident had occurred.

The Quiver trail at Okemo ends partway down the mountain, where it intersects with the "Liftline" trail, so-called because it is built under a chair lift known as the "Riblet," or "Number 3." On the day of the accident, the chair lift was not operat-

ing because of the wind. After skiing the Quiver, a skier must descend at least a portion of the Liftline trail to get down the mountain. Mrs. Nelson knew that the Quiver would eventually open out onto a liftline trail, as she and her husband had skied the Quiver on at least one previous occasion. Many Vermont ski areas have liftline trails similar to the one at Okemo, and the Nelsons were familiar with them because they had skied other liftline trails a number of times.[1]

When the Nelsons and Miss Bennett arrived at the intersection of the Quiver and Liftline trails, two or three chair lift towers, painted bright blue, were plainly visible to them. When the two Nelson children reached that point, they turned onto the Liftline trail, and skied past five or six lift towers before stopping to wait for the rest of the group. Miss Bennett skied past three towers, Nos. 13, 12 and 11, and stopped approximately fifteen yards below Tower No. 11, after hearing a clanging noise, which she first thought was the sound of an empty chair on the lift overhead hitting a stanchion. She looked back up the hill, saw a body lying in the snow, and began to sidestep back up, as it was obvious to her that the person lying in the snow was hurt, possibly seriously. Only when Mrs. Nelson approached from the uphill side of the figure lying in the snow and screamed, did Miss Bennett realize it was Mr. Nelson. Mrs. Nelson estimated that her husband was lying a foot or so from the base of Tower No. 11 when she found him. Miss Bennett thought the distance was five yards or less, and Larry Balboni, the first ski patrolman to arrive at the scene, estimated Mr. Nelson was six to eight feet from the tower.

Mr. Nelson was unconscious when his wife reached him and never regained con-

1. An expert in ski area design, James Ross Branch, testified that ski areas design and cut liftline trails for several practical reasons. First, the installation of a lift entails cutting a path up the mountain for construction, and the beginning of a trail is therefore made when the lift is put in. Second, lifts are installed on the straightest route up the mountain, and a trail under a lift therefore provides skiing on the "fall line" of a hill, considered by good skiers to be the best skiing. Third, an open trail under a lift provides essential access to the lift to remove stranded skiers if a lift should malfunction and stop. Finally, a liftline trail provides riders on the chairlift an opportunity to watch other skiers below them as they ride up the lift.

sciousness. He was brought down the mountain on a toboggan by the ski patrol and taken to Springfield Hospital in Springfield, Vermont, where he was operated on for several hours. He was then transported by ambulance to Mary Hitchcock Memorial Hospital in Hanover, New Hampshire, where he died at approximately 9:00 P.M. on the evening of February 20.

An autopsy performed at Mary Hitchcock Memorial Hospital revealed that the decedent had sustained "massive external and internal trauma" to the brain, a number of fractures of the skull, subdural and epidural hemorrhages, and multiple, comminuted fractures in the left pelvic region, including an impacted fracture of the left femoral head, with extensive laceration in the area caused by bone fragments, and accompanied by extensive bleeding. Surgery at the Springfield Hospital in Vermont was performed for the purpose of controlling internal bleeding in the pelvic region, and the autopsy revealed a major artery surgically tied off, but bleeding apparently continued until the time of death. Hip or pelvic trauma of the nature sustained by Mr. Nelson has a mortality rate of 50–75 percent, primarily because of the difficulty in controlling bleeding.

The upper portion of the Liftline trail at Okemo, including the portion where Tower No. 11 is located, is designated an "expert" or "most difficult" trail on the mountain's signs and trail maps, but the section of the trail which includes Tower No. 11 and extends uphill from Tower No. 11 for approximately 73 feet has a downhill gradient of 12°. That gradient would qualify as a "novice" slope according to ski area industry standards for grading trails. The trail in the immediate vicinity of Tower No. 11 is 70 feet wide and has a cross-slope gradient of approximately 3°, which is a minor grade of a nature often used for drainage purposes.

Tower No. 11, constructed of tubular steel, 18″ in diameter, sits on a concrete base approximately 4 feet square. The tower pole is not perpendicular to the slope of the hill but leans down the hill at ap-

proximately 10° from vertical, in order to decrease the bending movement of the tower. Because of this downhill leaning, a steel ladder affixed to the tower is on the uphill side. The ladder is constructed of flat, ¼″ thick plate steel, and ½″ tubular steel rungs. The ladder extends out from the tower approximately 8″. The ladder serves two purposes: it provides maintenance access to the overhead cables and wheels of the chair lift and it allows a means of emergency access to skiers who could be stranded in the chairs by a lift malfunction.

No one actually witnessed Mr. Nelson's accident. In fact, no one saw Mr. Nelson after he left Mrs. Nelson on the Quiver trail. Miss Bennett was aware that someone was skiing behind her, but she did not know it was Mr. Nelson. While there can be no doubt that Mr. Nelson collided with Tower 11, any explanation for the collision is speculative at best. Two possible theories were advanced at trial. The first theory is that Mr. Nelson lost control of his skis momentarily in the deep, powder snow and fell into the tower before he was able to regain his balance. The second theory, hypothesized by plaintiff's expert, Donald J. VanKirk, is that Mr. Nelson was skiing very close to the tower, possibly looking over his right shoulder in an effort to locate his wife behind him, caught his ski or ski boot on the concrete base of the tower, and was thrown into the metal tower itself. The concrete base was covered with snow at the time.

The latter explanation is the more plausible one. Mr. Nelson was evidently a competent skier who almost never lost control. Even if he lost control for a moment *and was watching the slope in front of him,* it is doubtful that he would have been unable to control his fall to avoid a *fatal* collision with the tower. Moreover, there was evidence that the buckles on Mr. Nelson's left ski boot were found to be sheared off after the accident. There was also evidence suggesting that Mr. Nelson might have been looking behind him for his wife, since she had asked him to watch her form. It is also very possible that he might not have seen

the tower to his left, if he was looking over his right shoulder, since his vision in his left eye was very poor and was not correctable with the glasses he wore.

In any case, there was no evidence which would suggest that defective or abnormal trail conditions caused Mr. Nelson to fall. All witnesses testified that the trail conditions at the time and place of the accident were ideal. Nor was there anything to indicate that the weather conditions were in any way to blame. Furthermore, the two children and Miss Bennett had traversed the trail without difficulty, and had passed Tower 11 and other towers without mishap.

There was conflicting testimony regarding the speed at which Mr. Nelson was travelling when his head struck the tower. Mr. VanKirk, the plaintiff's expert, is a specialist in bio-mechanics, a field concerned with the application of engineering to the medical field. Based upon his experience in bio-mechanics, his knowledge of the threshold speeds at which various "life-threatening" injuries occur, and his familiarity with medical records showing that doctors at Springfield Hospital could not palpate a linear skull fracture in the area of Mr. Nelson's head injuries, Mr. VanKirk concluded that the decedent's head struck the tower or tower ladder at a speed of 5–10 m. p. h. This conclusion was also based upon VanKirk's opinion that Mr. Nelson struck the tower first with his left hip and pelvic region, and that this part of his body absorbed the major part of the impact.

The defendant's evidence directly contradicted Mr. VanKirk's opinions as to the decedent's speed. Dr. J. B. McGill, a surgeon and expert skier of many years' experience, testified that trauma of the type seen in Mr. Nelson's pelvic region could not be sustained at speeds under 25 miles per hour. David Romeo, the defendant's specialist on impacts, is a research engineer and also an expert skier with experience as a ski racer and instructor. He associated the hip or pelvic injury with speeds in excess of 20 miles per hour. Mr. Romeo further testified, on the basis of studies he had conducted of average skiing rates, that ad-

vanced intermediate recreational skiers such as the decedent ordinarily ski at speeds between 15 and 25 miles per hour. Five miles per hour, which is no more than walking speed, is a speed too slow to maintain on virtually any downhill slope without enormous effort exerted by means of a strong "snowplow." Ten miles per hour is the speed of a beginner or very low intermediate skier. There was also testimony that the Poma lifts at Okemo travel up the mountain at 6 to 7 miles per hour, and that intermediate skiers consistently ski down the mountain at speeds twice to three times as fast as they ride up. Finally, Miss Bennett testified at trial that in spite of statements in a deposition that she was going 5–10 m. p. h., she believed that she was going faster down the mountain at the time of the collision than she went up on the Poma, probably about 15 m. p. h. Mr. Nelson was close behind her.

Based on all the testimony, the Court finds that Mr. Nelson was travelling at a speed between 15 and 25 m. p. h. when the accident occurred.

A form of protective foam padding, designed for use on chair lift towers, was commercially available prior to the 1971–72 ski season, and two or three Vermont ski areas, including Mt. Mansfield, had ordered pads from the manufacturer prior to the winter of 1971–72. The padding was approximately five feet high, and forty-eight inches wide, with two-inch thick foam in the center sixteen inches, and one-inch thick foam on the sides, or outer thirds. The padding was mentioned in spot advertisements in some ski area trade journals, but the advertisements made no specific claims regarding the effectiveness of the padding as a safety device. Moreover, no technical or independently researched articles showing the effectiveness of the padding had been published prior to February, 1972, to the knowledge of any witness who testified.

There were conflicting expert opinions as to the safety value of the tower padding and the effect it would have had in reducing or eliminating Mr. Nelson's injuries. Mr. VanKirk testified on the basis of a

series of tests conducted on the type of padding which was commercially available in 1972 that it could provide protection against life-threatening head injuries at speeds up to 9½–10 miles per hour at room temperature, and up to 12½ miles per hour at a temperature of –10°F. Based upon his opinion that the decedent struck the tower ladder at a speed of less than 10 m. p. h., Mr. VanKirk concluded that tower padding would have reduced Mr. Nelson's head injury to "less than fatal." It was also Mr. VanKirk's opinion that the injury to Mr. Nelson's pelvic region, though serious, would not have resulted in death.

Mr. Romeo conducted tests which were similar to those conducted by Mr. VanKirk. He concluded that tower padding could raise the threshold speed at which fatal head injuries would occur from 6–7 m. p. h. to 8–9 m. p. h. In other words, Mr. Romeo's tests indicated that fatal head injury *could* occur, with or without the 2″ padding available in 1972, at speeds of 10 m. p. h. or greater. Mr. VanKirk's tests suggested a threshold speed for fatalities, with or without the padding, of only about 2½ m. p. h. greater. Dr. McGill rendered an opinion that tower padding could reduce lacerations and contusions suffered by a skier sliding into a lift tower, but would not have prevented the blunt-impact trauma experienced by Mr. Nelson.

## CONCLUSIONS OF LAW

The complaint in this case raised several theories of liability, but at trial, only two were pressed. The plaintiff attempted to establish that the defendant was negligent in failing to cover Tower No. 11 with cushioned pads or some other form of protection, and in failing to place the ladder affixed to Tower No. 11 either on its downhill side or above head-level on the uphill side. The Court believes, however, that this case, like most ski injury cases, is governed by the doctrine of assumption of risk, and the plaintiff is not entitled to recover from the defendant on any theory of liability.

The plaintiff has proved nothing in this case which would place her in a better legal position than the plaintiff in *Wright v. Mt. Mansfield Lift,* 96 F.Supp. 786 (D.Vt.1951), the leading case for 25 years in this District on ski accidents. The plaintiff in *Wright,* an experienced skier, hit a snow-covered stump and fractured her leg while descending an intermediate trail on the slopes at Mt. Mansfield Ski Area in Stowe, Vermont. In directing a verdict for the defendants at the close of plaintiff's case, the Court assumed that the plaintiff would not have been injured if the defendant had removed the stump. The Court concluded, nevertheless, that the danger of encountering a snow-covered stump on a ski trail is inherent in the sport of skiing, and is an obvious and necessary risk to those who participate. *Wright v. Mt. Mansfield Lift, supra* at 791. The plaintiff knew of this risk and accepted it willingly, and on that basis, was barred from recovery.

Though the injuries suffered in this case were far more severe than those in *Wright,* the same principles of law apply. The plaintiff argues, nevertheless, that this case is distinguishable, and that the doctrine of assumption of risk should not be applied. She theorizes that the dangers created by unpadded liftline towers and exposed tower ladders, unlike the dangers created by snow-covered stumps, are not "necessary" to the sport of skiing and were therefore not "assumed" by the decedent. This theory misses the point. While it is arguable, perhaps, that some of the hazards created by towers situated in the Liftline trail at Okemo Mountain could have been reduced or eliminated prior to February 20, 1972 and were therefore not absolutely "necessary," the fact is that those hazards *were* "obvious and necessary" to any skier who chose to ski the trail on that date. The decedent, Thomas Nelson, was such an individual.

The towers, painted bright blue, were plainly visible to Mr. Nelson as he entered the Liftline trail from the Quiver. He passed two of the towers, Numbers 13 and 12, before reaching Tower Number 11. According to the plaintiff, the decedent had

skied the trail on a prior occasion. He had skied other trails with identical hazards. He knew or could easily observe that the towers were not padded and that metal ladders were affixed to the uphill side. From his past experience, he was surely cognizant of the dangers inherent in skiing a trail of this type and was aware of the control, concentration and judgment needed to negotiate the trail successfully. The hazard was in plain view. Nothing was hidden from his vision by accident or design. If he believed that the trail or the towers presented risks which were too great, he could have chosen not to proceed.[2] Yet, he chose to ski the trail, and he probably did so without unusual fear or hesitation. The trail was not a particularly difficult one for a skier of his ability. As he proceeded, Mr. Nelson willingly assumed all the obvious and necessary risks involved in this descent, including the danger that he might collide with a tower if he lost his control or concentration for an instant. Surely, ski towers are more obvious and more necessary to the sport of skiing than hidden tree stumps which serve no useful purpose. The Court therefore finds no need to repeat all that was so aptly said by Judge Gibson on this subject in *Wright*, though we rely upon the principles of that case as the basis for the conclusion reached here.

Although the case could be disposed of without further comment, the Court finds it worthwhile to note that in several respects the plaintiff in this case stands in a somewhat weaker legal position than the plaintiff in *Wright*. Even if the doctrine of assumption of the risk were inapplicable, there would remain serious obstacles to the plaintiff's recovery.

First, as to the defense of comparative or contributory negligence, the evidence strongly suggests that the decedent was skiing at a fairly rapid speed as he approached Tower No. 11, was not carefully observing his course of direction, and skied too close to the Tower and its concrete supports. In this connection the decedent was not exercising the prudence of a reasonable skier in negotiating the Liftline trail. If the Court was called upon to compare the decedent's negligence to any negligence of the defendant in this case, it would be hard pressed to find from the evidence that the decedent's negligence was equal to or less than any negligence of the defendant, a requisite to recovery in this State. 12 V.S.A. § 1036.

There is a further and even more serious obstacle to plaintiff's recovery—a failure of proof as to proximate cause. Assuming that Okemo Mountain had a duty on the date of the accident to pad its liftline towers, a question we need not decide in this case, it appears from the evidence that the two-inch foam pads which were commercially available in 1972, if properly installed on Tower No. 11, would *not* have prevented the decedent's tragic death. As suggested in the Court's findings, it appears from the evidence and from the opinions of at least two of the experts who testified that the decedent struck the tower or tower ladder at a velocity which would have resulted in his death, even if pads had been present. Though alternative types of protection, such as hay bales, were mentioned at trial, there was no evidence which would support a conclusion that hay bales or any other form of available protection would have prevented the death that occurred.[3]

---

**2.** The skier, not the ski area operator, is the logical one to make the choice as to whether he should proceed and assume the consequences of skiing in an area where a plainly apparent and necessary danger exists. Were it otherwise, ski trails, among the most enjoyable places to ski, might well have to be eliminated because of the obvious hazards of trees, rocks and adverse terrain which border every trail and which every skier faces with some degree of peril when he makes his decision to venture forth thereon.

**3.** There was testimony that ski areas in some instances place hay bales around the base of towers or other hazardous objects in or near ski trails. However, David Rock, the former General Manager of Mt. Snow, testified that hay bales absorb and hold moisture. When this moisture freezes, the bales become very hard and lose their elasticity. It appears that they may then become a potential hazard in their own right to those who may strike them.

Finally, the plaintiff's alternative theory of liability, respecting the placement of the ladder on Tower No. 11, does not appear tenable to the Court. The placement of the ladder on the uphill side of the tower was by no means unreasonable. The placements suggested by the plaintiff would have made the ladder impractical and unsafe for the workmen who ascended it regularly for maintenance reasons, and for those who descend it occasionally for emergency reasons. Furthermore, the Court is not satisfied that the injury to Mr. Nelson would have been any different or any less severe at the speed he was going, had he struck the metal pole itself and not the ladder which was affixed to it.

For the foregoing reasons, judgment shall issue for the defendant and for it to recover its costs.