**Estate of Martin A. Frant, Roger Frant, Administrator v. Haystack Group, Inc., et al.**

[641 A.2d 765]

No. 92-584

Present: Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed February 28, 1994

Motion for Reargument Denied May 3, 1994

*J. Eric Anderson* of *Cantini, Anderson & Oakman*, Manchester Center, *Richard M. Howland*, Amherst, Massachusetts, and *Jean M. Fielding*, Greenfield, Massachusetts, for Plaintiffs-Appellants.

*David L. Cleary* and *Thomas P. Aicher* of *David L. Cleary Associates*, Rutland, for Defendants-Appellees.

**Morse, J.** Martin Frant sued for injuries received when he skied into a wooden lift-corral post at defendant Haystack's ski area.* Haystack won summary judgment under Vermont's sports injury statute, which states that "a person who takes part in any sport accepts as a matter of law the dangers that inhere therein insofar as

---

\* Frant subsequently died from causes unrelated to the ski accident, and his estate was substituted as plaintiff.

they are obvious and necessary." 12 V.S.A. § 1037 (acceptance of inherent risks). We hold the trial court misconstrued § 1037 by concluding that, regardless of whether the ski area's use of the wooden posts was negligent, the statute prevented recovery as a matter of law because Frant accepted the "obvious and necessary" risk posed by the corral post. Instead, whether the ski area's use of wooden corral posts was an "obvious and necessary" risk should have been a threshold question of fact decided by the jury. If the answer was affirmative, § 1037 would have entitled the ski area to a verdict as a matter of law. But if the answer was negative, then Frant's recovery should have been disallowed only if his negligence in encountering the risk posed by the corral post was greater than or equal to the ski area's negligence in creating that risk. See 12 V.S.A. § 1036 (comparative negligence). We reverse and remand for trial.

On a February day in 1987, ten-year-old Frant was skiing on the Haymaker Trail at Haystack Mountain, a trail he had already skied at least twice that day. Frant described himself as an intermediate-to-advanced skier who could handle most of the trails at mountains he had previously skied. The boy was injured when he skied into a lift corral, a holding area designed to funnel skiers into a row to board the lift. He struck one of a series of wooden posts supporting the rope lines of the corral. The unpadded post was four inches by four inches by eight feet tall and stood in frozen ground, having been installed before the ski season. Frant admitted he was skiing "pretty fast" and that he had seen the post on his earlier runs. In his words, he "messed up."

Haystack moved for summary judgment on the basis that the wooden post was an "obvious and necessary" danger inherent in downhill skiing, and, under 12 V.S.A. § 1037, Frant had assumed the risk of this danger as a matter of law. Frant opposed summary judgment by raising a disputed factual issue about whether the corral's unpadded wooden post construction, as opposed to the corral itself, was "necessary" within the meaning of 12 V.S.A. § 1037. Frant submitted the affidavit of a ski-area safety expert who stated that it was a common practice to pad corral posts in anticipation of skiers colliding with a post or pushing someone else into one. The affidavit further stated that there was "definitely a safer way of providing a [corral] line and support without using 4″ x 4″ posts," by using "forgivable [plastic] types." The expert's opinion was basically that Frant's injury was foreseeable and resulted from "a well known avoidable hazard in the ski industry." The trial court, nevertheless,

held as a matter of law under 12 V.S.A. § 1037 that "a wooden guide post at the corral leading to the chair lift is an obvious and necessary risk."

■ This is our first opportunity to construe 12 V.S.A. § 1037. In order to interpret this statute, we must determine its intent by analyzing not only its language, but also its purpose, effects and consequences. See *In re R.S. Audley, Inc.*, 151 Vt. 513, 517, 562 A.2d 1046, 1049 (1989). The avowed purpose for the statute was extensively set out in § 1 of the Act (preamble):

> Since 1951, the law relating to liability of operators of ski areas in connection with downhill skiing injuries has been perceived to be governed by the doctrine of volenti non fit injuria as set forth in the case of Wright v. Mt. Mansfield Lift, Inc., 96 F. Supp. 786, decided by the United States District Court for Vermont. In 1976, in the case of Leopold v. Okemo Mountain, Inc., 420 F. Supp. 781, decided also by the United States District Court for Vermont, the doctrine of assumption of risk was held to be applicable in a downhill skiing injury case, despite the adoption of a comparative negligence statute by the Vermont General Assembly in 1970. In 1977, in the case of Sunday v. Stratton Corporation, the Superior Court for Chittenden County of the state of Vermont ruled that the defense of assumption of risk was inappropriate in a comparative negligence case involving a downhill skiing injury.
>
> It is a purpose of this act to state the policy of this state which governs the liability of operators of ski areas with respect to skiing injury cases, including those resulting from both alpine and nordic skiing, by affirming the principles of law set forth in Wright v. Mt. Mansfield Lift, Inc., and Leopold v. Okemo Mountain, Inc., which established that there are inherent dangers to be accepted by skiers as a matter of law.

1977, No. 119 (Adj. Sess.), § 1 (eff. Feb. 7, 1978). Therefore, to understand § 1037, we must begin by examining the common-law principles found in the Vermont federal and state cases mentioned in the statement of purpose, *Wright, Leopold,* and *Sunday.*

In *Wright,* the plaintiff broke her leg after colliding with a snow-covered tree stump while skiing down a trail in January 1949. Relying on the doctrine of volenti non fit injuria (one who consents cannot claim injury), the court held that those responsible for safety at Stowe's ski area were not liable for the accident. 96 F. Supp. at 791.

The court reasoned that, when plaintiff chose to ski, she accepted "the dangers that inhere in [skiing] so far as they are obvious and necessary." *Id.* "Obvious," in this context, does not mean something easily observed by a skier who looked. To the contrary, the court stated the trail, at the place of the accident, "was smooth and covered with snow. There were no unexpected obstructions showing." *Id.* Rather, an obvious risk was one inherent in the nature of the sport. In skiing, tree stumps are an obvious risk because the trails are "areas cleared down the rough mountain side . . . by cutting trees, by bulldozing and by other methods." *Id.* at 788. Tree stumps were a "necessary" risk because the effort required to remove them was deemed, at that time, to be an unreasonable burden. Indeed, it would be an "impossible" demand to expect that "the terrain of a ski trail down a mighty mountain" could reasonably be kept hazard-free. *Id.* at 791. Using a directed verdict standard, on facts most favorable to the plaintiff skier, the court held that the defendants owed no duty to protect their skiing patrons from stumps under the snow, and, therefore, skiers were deemed to have assumed the risk of injury skiing over the rough terrain. *Id.* at 790–91.

Twenty-five years later in *Leopold*, a case tried to court, the ski area was found not liable to the estate of a skier who was killed by colliding with an unpadded ski lift tower. 420 F. Supp. at 787. The court ruled that the tower was an obvious risk—obvious, not in the sense that word was used, as a term of art, in *Wright*, but in the sense that the plaintiff's decedent, an experienced skier familiar with the ski area, *knew* that the bright blue towers were unpadded and willingly risked colliding with a tower if he lost control while negotiating the trail. *Id.* The court also concluded that ski towers, which serve a useful purpose, were "more necessary to the sport of skiing than [the] hidden tree stumps" in *Wright*. *Id.* The court acknowledged that some risks presented by the towers—for example, that they were unpadded—were not "absolutely necessary" in that the ski area could have reduced or eliminated the risk before the accident. *Id.* at 786. But the court never reached the issue of the ski area's duty to do so, instead deciding the case on the skier's awareness of the risk. *Id.* at 787.

Although *Leopold* paid lip service to *Wright*, see *id.* ("we rely upon the principles of [*Wright*] as the basis for the conclusion reached here"), the rationales of the two cases appear to be fundamentally incompatible. Because § 1037's preamble purports to adopt both *Wright* and *Leopold*, we must first see whether the two cases can be

reconciled, and, if not, what principles the legislature intended to carry forward from the two cases into § 1037. The key to answering both questions is *Sunday v. Stratton Corp.*, 136 Vt. 293, 390 A.2d 398 (1978), the third downhill skiing case, mentioned along with *Wright* and *Leopold*, in § 1037's preamble. The preamble refers to the trial court decision in *Sunday*, which was apparently the immediate impetus for enacting § 1037; this Court did not rule on the *Sunday* appeal until after § 1037 went into effect.

In *Sunday*, the plaintiff was injured after becoming entangled in concealed brush while skiing on a novice trail. 136 Vt. at 297–98, 390 A.2d at 401. The ski area moved for a directed verdict, claiming to rely on the assumption-of-risk standard declared in *Wright*. *Id.* at 297, 299, 390 A.2d at 400, 401. The trial court denied the motion, ruling that whether the concealed brush was an assumed risk was a disputed question of fact to be decided by the jury. It also ruled that the plaintiff's negligence, if any, in encountering the risk would be submitted to the jury under Vermont's comparative negligence statute, 12 V.S.A. § 1036.

Section 1037's preamble treats the trial court ruling in *Sunday* as a major departure from *Wright*, a signal that something had gone awry in the law of ski-area liability. Undoubtedly, media coverage of the *Sunday* trial caused alarm in the legislature that ski areas were about to be subjected to increased liability. In our decision on the *Sunday* appeal, we noted that the trial court's comments in denying the motion for a directed verdict prompted publicity:

> A resulting front page article appeared in the Burlington Free Press, headlined "Ruling May Broaden Liability of Ski Resorts." . . . In the middle of the article . . . was a phrase . . . that the presiding judge had stated "frankly" that he did not think ski areas should be allowed to operate any longer "hiding behind" the philosophy that ski accidents are a risk people assume when they go skiing.

136 Vt. at 305, 390 A.2d at 404–05. During committee consideration of § 1037, a senator remarked, "If [*Sunday*] had not come out the way it did in terms of [the trial judge's] ruling on assumption of risk, they [the ski areas] would not be here today." Hearings on H. 417 before Senate Judiciary Committee, Jan. 18, 1978, at 3 (statement of Senator David Gibson); see Note, *Assumption of Risk after Sunday v. Stratton Corporation*, 3 Vt. L. Rev. 129, 130 (1978) (describing media coverage and legislative concern).

The legislature's clear purpose then was to return the law of ski-area liability to where it had existed prior to the *Sunday* trial. Unfortunately, the legislature's task in drafting § 1037 was probably more daunting than it realized. *Wright* and *Leopold*, the prior cases cited in the preamble, were not facially consistent. Moreover, they were federal cases, not binding on this Court, which had never had the opportunity to interpret them or to rule independently on ski-area liability. Only after the passage of § 1037 did this Court have an opportunity in the *Sunday* appeal to make two important clarifications: (1) that *Wright* and *Leopold* were irreconcilable, and (2) that the trial court's result in *Sunday* had been consistent with *Wright* (and was affirmed as such).

Affirming the judgment for the plaintiff in *Sunday*, this Court explained that there are two different concepts, both commonly labeled "assumption of risk." 136 Vt. at 301–04, 390 A.2d at 402–04. The Supreme Court of New Jersey succinctly summarized the two concepts:

> In one sense (sometimes called its "primary" sense), [assumption of the risk] is an alternate expression for the proposition that defendant was not negligent, *i.e.*, either owed no duty or did not breach the duty owed. In its other sense (sometimes called "secondary"), assumption of risk is an affirmative defense to an established breach of duty.

*Meistrich v. Casino Arena Attractions, Inc.*, 155 A.2d 90, 93 (N.J. 1959). The rationale in *Wright* relied on primary assumption of risk, in *Leopold* on the secondary sense, although neither decision used this terminology. The fact that these two concepts existed and were used somewhat interchangeably in prior ski-area liability cases has created confusion about which standard the legislature intended to incorporate into § 1037.

In *Sunday*, we adopted the widely accepted primary assumption-of-risk rule applied in *Wright* and explained that stating that a skier assumes inherent dangers of a sport is no different from stating that the ski area did not breach any duty owed to the skier. See 136 Vt. at 301, 390 A.2d at 402 ("primary" assumption of risk "is the equivalent of, and better put as, a claim that defendant owed plaintiff no duty with respect [to the particular risk]"). Our analysis in *Sunday*, therefore, is consistent with *Wright*. We agree with the Second Circuit that

the only difference between *Wright* and *Sunday* is in their results, not in the principles of controlling law. In *Wright*, the defendant did not breach any duty it owed to plaintiff; in *Sunday*, it did. In both cases, though, the defendant's duty—to warn of or correct dangers which in the exercise of reasonable prudence in the circumstances could have been foreseen and corrected—was the same.

*Dillworth v. Gambardella*, 970 F.2d 1113, 1119 (2d Cir. 1992).

Thus, in *Wright*, the injured skier did not personally know of, appreciate, and consent to skiing into stumps hidden under the snow cover. Rather, she and all skiers on the mountain were *deemed* to consent to all hazards that reasonably careful trail maintenance could not eliminate. "Deemed consent" is a legal fiction that explains the lack of a ski area's duty to remove or warn skiers of tree stumps on a trail. The ski area in *Wright* was, therefore, not at fault regardless of whether plaintiff appreciated, and actually consented to assume, risks in the sport of skiing. In *Sunday*, the ski area was held to have a duty to remove brush on the trail; indeed the ski area's own employees and experts testified that brush could and should have been eliminated. 136 Vt. at 298, 390 A.2d at 401. Both cases turn on primary assumption of risk.

In contrast to both *Wright* and *Sunday*, *Leopold* was based on secondary or explicit assumption of risk. There, the injured skier was *not* deemed to have consented to lift-tower hazards on the basis that the ski area had done all that was reasonably expected of it in maintaining the towers in a reasonably safe condition. Rather, the *Leopold* court found that, even assuming Okemo could have been more careful, the injured skier was "cognizant of the dangers . . . [t]he hazard was in plain view," he "could have chosen not to proceed[, and y]et, he chose to ski the trail" and "willingly assumed . . . the danger that he might collide with a tower if he lost his control or concentration for an instant." 420 F. Supp. at 787.

Haystack relies exclusively on a theory of secondary assumption of the risk from *Leopold*: Frant saw the posts, which were obvious, and such posts were a necessary part of skiing; judgment, therefore, should be for defendant as a matter of law. According to Haystack, the issue of primary assumption of risk does not arise because it has no duty to abate risks that are obvious and necessary. Frant turns the analysis around, relying on *Wright's* primary assumption of risk: whether the post construction was necessary and its dangers obvious are questions of material fact that must be raised before his negli-

gence becomes an issue. As in any tort action, urges plaintiff, the question of defendant's duty is the threshold question to evaluating plaintiff's negligence, if any.

We agree with the parties that § 1037 can only incorporate one of these views, and believe that the *Wright/Sunday* theory of primary assumption of risk is the one that has been retained. First, the impetus for § 1037 came from the trial court rulings in *Sunday*, which were based on interpretations of *Wright*; *Leopold* was never raised. To the extent that prior ski-area liability law was threatened, *Wright*, not *Leopold*, was implicated. In light of publicity surrounding the *Sunday* jury trial, which undoubtedly informed the legislative debate on ski user liability, we believe § 1037's language and preamble indicate the legislature wished to bolster the concept of primary assumption of the risk as first announced in *Wright*, presumably to dispel any perception that it had been jettisoned by the trial court in *Sunday*. As it turned out, 12 V.S.A. § 1037 and the analysis in *Sunday* on appeal decided after § 1037 enactment are completely consistent. Compare § 1037 (as a matter of law, one who participates in sport "accepts . . . the dangers that inhere therein insofar as they are obvious and necessary") with *Wright*, 96 F. Supp. at 791 (one who takes part in sport "accepts the dangers that inhere in it so far as they are obvious and necessary").

Moreover, *Leopold*, which depended on the court's findings of fact, is unworkable as precedent for applying a directed verdict standard. The decision is also somewhat confusing because it includes language incorporating the doctrine of primary assumption of risk and purporting to follow *Wright*. But the opinion is also replete with language about how the skier in effect knew of the risk, appreciated the extent of the dangers, and consented to assume it, see 420 F. Supp. at 787, the classic elements of secondary assumption of risk. See *Sunday*, 136 Vt. at 303, 390 A.2d at 404. Much of the confusion was engendered because *Leopold* was a trial to court. Because there was no need to charge a jury, the court simply skipped over the threshold question of whether the ski area breached a duty to the skier by leaving ski lift towers unpadded, which was the most difficult—and most contested—factual issue. Instead, it focused on another part of the case, which it thought more soundly grounded, and found as a fact that plaintiff had assumed the risk in the secondary sense. *Leopold*, 420 F. Supp. at 787. The court, in effect, decided the issues in the case backwards, reaching the plaintiff's negligence before considering the defendant's. This sequence would be impractical in a jury trial.

Yet, given the muddling of assumption of risk in Vermont's case law, some question may linger whether by enacting § 1037, the legislature intended to provide *more* protection from liability for ski areas than the law of negligence and primary assumption of risk did. The drafters of § 1037 did not distinguish between primary and secondary assumption of risk, probably believing the doctrine encompassed a single concept. For instance, § 1037, by its own terms, operates "[n]otwithstanding the provisions of section 1036," that is, operates notwithstanding comparative negligence. Comparative negligence, however, applies only when both defendant and plaintiff are negligent. But the statute then goes on to describe primary assumption of risk, a concept that does not address plaintiff's fault (secondary assumption of the risk) in any way. The risk in the primary sense may be hidden, like the one in *Wright*, and not subject to the skier's reasonable perception. If defendant has no duty to guard against a risk, plaintiff's fault in encountering the hazard is irrelevant.

■ Although some confusion is engendered by reading the statute against the purpose stated in the preamble, merging secondary assumption into the statute would lead to absurd results in more extreme cases. For example, a skier who encountered a readily apparent barbed-wire, hard-metal post corral may have been foolish to ski there, but we hardly think the legislature intended to bar the injured skier's cause of action as a matter of law.

■ ■ In drafting 12 V.S.A. § 1037, the legislature avoided cataloguing fact-specific examples of "obvious and necessary" risks inhering in sports such as skiing. The legislature thereby recognized, as *Wright* demonstrates, that yesterday's necessary skiing risks tend to become, with the passage of time and advancement of technology, reasonably avoidable. At the time *Wright* was decided, skiers were forced to assume the risk of colliding with snow-covered tree stumps, because grooming and inspection techniques in 1949 had not evolved to where it was feasible to detect and remove, or warn skiers about, such hazards. As Frant's expert witness suggested, state-of-the-art technology has evolved well beyond the early stages. Even the ski industry now concedes that today the failure to detect a tree stump could serve as the basis for negligence "in view of improved grooming techniques." See *Sunday*, 136 Vt. at 300, 390 A.2d at 402. The language of 12 V.S.A. § 1037 is broad enough to account for safety improvements in the skiing industry. We do not think the legislature's purpose in reasonably protecting the skiing industry is compromised

by asking a jury to supply a contemporary sense of what constitutes an obvious or necessary risk. Skiers should be deemed to assume only those skiing risks that the skiing industry is not reasonably required to prevent.

In this case, Frant was not given the opportunity to prove through his expert witness that technology had evolved such that the wooden corral post system used by defendant was no longer, if it had ever been, an "obvious and necessary" risk. The issue of defendant's duty was effectively removed from the case. We do not believe the legislature intended this result.

*Reversed and remanded.*

**Allen, C.J.,** concurring. I concur in the result because disputed facts concerning the construction of the corral raise a challenge to its necessity and preclude a grant of summary judgment. See *Wesco, Inc. v. Hay-Now, Inc.*, 159 Vt. 23, 26, 613 A.2d 207, 209 (1992) (to prevail on motion for summary judgment, there must be no genuine issues of material fact). Ordinarily, the question of whether a danger is obvious and necessary within the meaning of 12 V.S.A. § 1037 should be resolved by a jury. *Dillworth v. Gambardella*, 970 F.2d 1113, 1123 (2d Cir. 1992).