## USGen New England, Inc. v. Town of Rockingham
## USGen New England, Inc. v. State of Vermont

[838 A.2d 927]

Nos. 01-426 and 01-427

Present: **Amestoy, C.J., Dooley, Morse,**[1] **Johnson and Skoglund, JJ.**

Opinion Filed November 7, 2003

---

[1] Justice Morse sat at oral argument but did not participate in this decision.

*Robert E. Woolmington* of *Witten, Woolmington, Bongartz, Campbell and Boepple, P.C.*, Manchester Center, and *Philip Burling* of *Foley, Hoag & Eliot LLP*, Boston, Massachusetts, for Plaintiff-Appellant.

*Richard H. Saudek* and *David L. Grayck* of *Cheney, Brock & Saudek, P.C.*, Montpelier, for Defendant-Appellee Town of Rockingham.

*William H. Sorrell*, Attorney General, *William E. Griffin*, Chief Assistant Attorney General, and *Mary L. Bachman*, Special Assistant Attorney General, Montpelier, for Defendant-Appellee State of Vermont.

¶ 1. **Dooley, J.** Following the deregulation of the electrical power markets, the Vermont General Assembly in 1998 and again in 1999 temporarily "froze" the grand list valuation of hydroelectric generating facilities for property tax purposes. The "freeze" set the valuation of these properties at the 1997 values for the tax years 1998, 1999, and 2000. Plaintiff USGen New England, Inc. (USGen), the owner of hydroelectric power plants affected by the freeze — including the Bellows Falls facility located in the Town of Rockingham — filed an appeal challenging the 1999 valuation of this property as well as the constitutionality of the freeze.[2] USGen also filed a second action seeking a declaratory judgment

---

[2] USGen originally brought two separate challenges to the 1999 grand list valuations, one involving the Bellows Falls facility located in Rockingham and one involving the Harriman

that the freeze was unconstitutional. The Windham Superior Court issued a partial judgment on the pleadings, holding that the legislative acts were constitutional. The court also denied USGen's request to offer evidence on the fair market value of the frozen assets, which USGen had argued was relevant to the remaining unresolved issues. USGen argues that the judgment on the pleadings was in error and that the restriction on the introduction of evidence makes the freeze legislation unconstitutional as applied. We affirm.

¶ 2. The freezing of the grand list valuation for all hydroelectric generating facilities was originally effected by the enactment of section 78 of Act 71 of 1998, see 1997, No. 71 (Adj. Sess.), § 78, eff. March 11, 1998, which froze the listed values at the April 1, 1997 listed value until January 1, 2000. According to Act 71, the freeze would not apply to three situations: (1) where a tax stabilization agreement existed that predated the legislation; (2) where the owner of the hydroelectric facility entered into an agreement with the municipality not to reduce the grand list value; and (3) where the municipality completed a reappraisal of all taxable real estate after April 1, 1997. The freeze was later extended to June 30, 2000 by the enactment of section 23 of Act 49 of 1999.[3] See 1999, No. 49, § 23, eff. June 2, 1999.

¶ 3. Although the 1998 act did not include an express statement of legislative purpose, the stated purpose for the 1999 extension was as follows:

> [T]o provide additional time for the owners of hydroelectric generating facilities and the municipalities in which they are located to more accurately determine the fair market value of these special and unique utility assets in a changing and deregulated utility market, for greater coordination with and assistance from the Department of Taxes, to permit expert inde-

facility located in Whitingham. These two challenges, despite being separately docketed, were heard together in the Windham Superior Court, and the trial court's orders pertained to both. However, although both cases were appealed to this Court at the same time, the case involving the Whitingham facility was settled before the appeal was heard, and the Whitingham facility appeal was thereby dismissed. Thus, we address here only the challenge to the grand list valuation of the Rockingham facility.

[3] The extension legislation also provided that if the taxable value of the hydroelectric generating facilities is more or less than the frozen value after the freeze expired, "any resulting adjustments in the taxable value of such property shall be phased in over the following period of years, not to exceed ten, until the full taxable value is reached." 1999, No. 49, § 39(c). USGen challenged this phase-in provision in its complaint, but the superior court ruled that the challenge was premature and did not address it on the merits. USGen has not appealed that ruling.

pendent appraisals, and to facilitate and continue negotiations regarding determination of fair market values.

1999, No. 49, § 23(a), eff. June 2, 1999.

¶ 4. In September 1998, six months after the initial freeze went into effect, USGen purchased from New England Power Company, Inc. (New England Power) several hydroelectric plants, including the Bellows Falls station in Rockingham. This purchase consisted primarily of the generation assets of these facilities, with New England Power retaining the transmission assets.

¶ 5. At the time of the initial freeze, the Bellows Falls hydroelectric facility was owned entirely by New England Power. The property — consisting of electric generation assets, transmission assets, and other land — was listed on the Rockingham grand list at a single value of $94,000,000 for the tax year 1997, as it had been for several years previous. As part of the sale of this facility, USGen and New England Power agreed to allocate the 1998 property taxes on the $94,000,000 grand list value by a ratio of 87% to USGen for the generation assets and other land, and 13% to New England Power for the transmission assets. This allocation was communicated to the Town of Rockingham (the Town). USGen and New England Power proceeded to pay the 1998 property taxes on the Bellows Falls facility based on this allocation.

¶ 6. Subsequently, in preparing its April 1, 1999 grand list, the Town again applied the 87%/13% allocation ratio to the frozen value. According to the Town, it used the 87%/13% ratio based on (a) USGen's and New England Power's allocation of taxes in connection with the 1998 sale; (b) a statement by USGen's representative; (c) a letter to the Town from New England Power; and (d) testimony under oath given on August 23, 1999 by representatives of New England Power and USGen to the Rockingham Board of Civil Authority. The Town also used the 87%/13% allocation in preparing its April 1, 2000 grand list. Thus, as a result of the freeze and its extension and the Town's use of the 1998 allocation of value between USGen and New England Power, the value that was used to calculate USGen's property taxes on its Bellows Falls' assets for tax years 1999 and 2000 was $81,780,000 (87% of $94,000,000).

¶ 7. In September 1999, three months after the General Assembly extended the freeze, USGen appealed the April 1, 1999 Rockingham grand list valuation of the Bellows Falls facility to the Windham Superior Court, pursuant to 32 V.S.A. § 4461.[4] In that appeal, USGen argued that

---

[4] New England Power also appealed the April 1, 1999 Rockingham grand list valuation of its assets at the Bellows Falls facility. The Town and New England Power subsequently agreed

the Town (1) failed to determine accurately the appraisal value of the facility based on fair market value and equalization with comparable properties; (2) failed to accurately allocate the property values between USGen and New England Power; and (3) acted pursuant to unconstitutional legislative acts. USGen also filed a separate action in October seeking a declaratory judgment that the 1998 and 1999 acts of the Legislature were unconstitutional. The parties, including the State as intervenor, agreed to stay the declaratory judgment action in the hope that a decision on the constitutional issues would be rendered unnecessary by the resolution of the tax appeals. The parties then engaged in extensive discovery in preparation for trial.

¶ 8. As part of discovery, each of the parties hired experts to appraise the value of the generating facility and "other land" — land not associated with either the generating assets or the transmission assets — at the Bellows Falls property. Although USGen and the State now appear to disagree over the actual range of values arrived at by these experts,[5] it is clear that there existed a wide variety of opinions concerning the value of the generating assets, and that some of the expert valuations are significantly lower than the $81,780,000 value on Rockingham's grand list.

¶ 9. On June 15, 2001, the Town filed a motion for judgment on the pleadings pursuant to V.R.C.P. 12(c), arguing that the legislative acts imposing the freeze were constitutional. USGen opposed the motion, and filed a motion of its own seeking relief from the court's order staying all discovery in the declaratory judgment action. In that motion, USGen sought approval to conduct discovery respecting the appraisal of the other land at the Bellows Falls facility and the allocation of values between USGen and New England Power.

¶ 10. After hearing arguments on the Town's motion, the court issued a partial judgment on the pleadings on July 23, 2001. The court ruled that the legislative acts were constitutional and that "they preclude the court from determining a value for the hydro-electric facilities for the April 1,

---

in a July 2000 settlement that the 1999-2000 grand list valuation of the New England Power assets at the Bellows Falls facility would equal 13% of the 1999 assessed valuation of the entire property owned by both USGen and New England Power. The settlement agreement also provided for a reduced assessment of the New England Power portion of the property in 2000-2001.

[5] According to USGen, the expert valuations ranged from $42,259,499 (USGen's experts) to around $63,000,000 (both the State and the Town of Rockingham's experts). In contrast, the State claims that the valuations ranged from $28,865,356 (USGen's low estimate) to $96,250,000 (the Town's high estimate). While this appeal was pending in this Court, the Windham Superior Court tried the appeal of USGen's 2001 listed value, the first year after the expiration of the freeze. The court found the value to be approximately $90,300,000.

1999 listing other than that established by the legislature." As such, the court dismissed the declaratory judgment action, which involved solely the constitutionality of the freeze. Recognizing that ruling on constitutionality did not dispose of all of the issues in the case, the court stated that it would still take evidence on: (1) the extent to which the Bellows Falls lands now owned by USGen were not covered by the freeze, and whether any such lands decreased in value from April 1, 1997 to April 1, 1999, and (2) whether the frozen value of the Bellows Falls hydroelectric facility had been properly allocated between USGen and New England Power.[6] The court emphasized, however, that it would not take evidence or make findings regarding the fair market value of the hydroelectric facilities on April 1, 1999, since "no revaluation of the power plants on April 1, 1999 is necessary."

¶ 11. Four days later, USGen submitted an "offer of proof" and request for evidentiary ruling, arguing that "[t]he only reasonable method" to allocate the frozen April 1999 grand list value between USGen and New England Power was to determine the fair market value of all the frozen assets as of April 1, 1999, and use the relative values of the generation assets, transmission assets, and other land at that time to determine what percentage of the frozen 1997 grand list value is attributable to USGen. USGen asked the court to thereby allow it to present expert testimony relating to this method of calculation. The court denied USGen's request in an August 8, 2001 entry order, stating that "the Legislature has clearly precluded litigation of just this issue [i.e. the fair market value of the frozen assets]."

¶ 12. The parties subsequently entered into a stipulation confirming the 87%/13% allocation — "[w]ithout waiving any claims or defenses" — for the purpose of allowing the court to issue a final judgment order and thus allowing the case to be appealed. The parties also stipulated that the value of USGen's lands not associated with the generation facilities was $645,000, leaving the value of USGen's Bellow Falls generation facility affected by the freeze at $81,135,000. The trial court issued a final judgment order on August 27, 2001 based upon these stipulations and its prior rulings. USGen then appealed the July 23, 2001 partial judgment on the pleadings and the August 8, 2001 entry order to this Court. The declaratory judgment action and the tax appeal were later consolidated on appeal.

---

[6] The Town argued that USGen waived its right to challenge the allocation by failing to respond to the Town's letter inviting USGen's participation in the allocation process. The trial court ruled, however, that "this argument is fact-based and therefore cannot appropriately be decided on motion for judgment on the pleadings."

¶ 13. USGen's first argument on appeal is that the trial court erred in dismissing on the pleadings the facial constitutional challenge to the legislative acts imposing the freeze. USGen contends that property owners in Vermont are entitled by the Common Benefits and Proportional Contribution Clauses of the Vermont Constitution, Vt. Const. Ch. I, Arts. 7 and 9, and the Fourteenth Amendment of the United States Constitution to have their property valued in the same way as all other property in the state is valued, i.e., based on fair market value. See 32 V.S.A. § 3481(1) (defining "appraisal value" as fair market value). The trial court rejected these challenges and held that the freeze was constitutional. We agree with the trial court that Acts 71 and 49 are constitutional on their face.

¶ 14. On review, this Court will affirm a judgment on the pleadings if the plaintiff's pleadings contain no allegations that if proven would permit recovery. *Hinsdale v. Sherman*, 171 Vt. 605, 606, 764 A.2d 1218, 1219 (2000) (mem.). We will consider as true all factual allegations in the pleadings of the nonmoving party and all inferences that can be drawn from them; allegations by the moving party to the contrary will be considered as false. *Id.*

■ ¶ 15. The more appropriate analysis to apply here, where there is a constitutional challenge to a legislative act that temporarily alters the relative tax burden of a particular class of taxpayers, is the jurisprudence of the Proportional Contribution Clause, Vt. Const. Ch. I, Art. 9. Article 9 provides in relevant part: "That every member of society hath a right to be protected in the enjoyment of life, liberty, and property, and therefore is bound to contribute the member's proportion towards the expence of that protection . . . ." The Proportional Contribution Clause imposes no greater restriction on governmental action than the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. See *Schievella v. Dep't of Taxes*, 171 Vt. 591, 593, 765 A.2d 479, 481-82 (2000) (mem.); *Alexander v. Town of Barton*, 152 Vt. 148, 157, 565 A.2d 1294, 1299 (1989). Thus, the test of validity of governmental action under the clause is "the rational basis test used for federal equal protection analysis." *Alexander*, 152 Vt. at 157, 565 A.2d at 1299.

> The limits are quite wide. Thus, reasonable schemes of taxation must have flexibility, and some difference of treatment between citizens is virtually inevitable.

*Schievella*, 171 Vt. at 593, 765 A.2d at 482.

¶ 16. We find that our decision in *Alexander v. Town of Barton* controls here. That case involved a taxpayer challenge to a "rolling reappraisal"

method of assessment in which every two years the town would reassess only that class of property determined by the State Tax Department to be "most in need" — i.e., where on average there was the greatest percentage discrepancy between the listed value of the properties in the class and their fair market value. The taxpayers argued, inter alia, that this "rolling reappraisal" method violated the Proportional Contribution Clause. Applying the standards set out above, we concluded that the town's actions had a rational basis — "keeping appraisals as current as possible within the resources available by attacking the worst underassessment problem areas." *Alexander*, 152 Vt. at 157-58, 565 A.2d at 1299. We also noted other cases upholding similar "cyclical" reappraisal methods on the grounds that such a method is reasonable given the nondiscriminatory aim and the limited resources of the municipality. See, e.g., *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 353 (1918) (finding no "purpose or design to discriminate" and that "[the town's] action is not incompatible with an honest effort in new and difficult circumstances to adopt valuations not relatively unjust or unequal"); *Carkonen v. Williams*, 458 P.2d 280, 289 (Wash. 1969) ("The evidence indicates quite clearly that, to the best of their ability, and with their limited staffs, the assessors involved were honestly endeavoring to pursue a systematic nondiscriminatory cyclical approach to revaluation . . . ."). Since the town's actions had a rational basis and there was no evidence of intentional discrimination, we concluded that the appraisal method was constitutional. *Alexander*, 152 Vt. at 157-60, 565 A.2d at 1299-1301.

¶ 17. Decisions that have followed *Alexander* are entirely consistent with it. In *Nordlinger v. Hahn*, 505 U.S. 1 (1992), the United States Supreme Court upheld Proposition 13, California's so-called "welcome stranger" real estate tax system. This system created widely disparate tax burdens among owners of similar pieces of property: longer term property owners paid lower property taxes reflecting historic property values, while newer owners of comparable properties paid higher property taxes reflecting more recent acquisition values. Applying the rational basis test, the Court concluded that Proposition 13 complied with the Equal Protection Clause:

> The appropriate standard of review is whether the difference in treatment between newer and older owners rationally furthers a legitimate state interest. In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been consid-

ered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational. This standard is especially deferential in the context of classifications made by complex tax laws. [I]n structuring internal taxation schemes the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.

*Id.* at 11 (internal citations omitted). Based on this deferential standard, we have no problem concluding that the freeze is constitutional. See also *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 547 (1983) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes."); *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 526 (1959) ("The States have a very wide discretion in the laying of their taxes.").

¶ 18. More directly on point is the Connecticut Supreme Court case of *Stafford Higgins Indus., Inc. v. City of Norwalk*, 715 A.2d 46 (Conn. 1998). There, a taxpayer challenged the constitutionality of a state statute allowing a municipality to stay the implementation of the municipality's decennial revaluation for up to two years and the City of Norwalk's action in refusing to implement its revaluation. The case revolved around a 1994 action by the city of Norwalk, done pursuant to the challenged statute, twice staying the implementation of the city's 1993 decennial revaluation, which had the effect of retaining the real property valuations of 1983 for the grand lists of 1993 through 1996. *Id.* at 48. Plaintiff alleged that the city took this action because the revaluation would have resulted in significantly shifting the property tax burden from single-family residences to commercial properties in accordance with the increases of the fair market value of the latter property. *Id.* at 56.

¶ 19. The court applied the rational basis test set out in *Nordlinger* and found the city's action to be constitutional. According to the court, the rational basis for the city's action "was to implement, in an orderly manner, the changes to the existing property taxation system anticipated to be enacted in the next legislative session as a result of the recommendations of the property tax reform commission." *Id.* The court also agreed with the trial court's finding that the purpose of the city's action was "not to burden commercial property owners but to alleviate the burden on single-family homeowners, that is, 'in spite of', not 'because of' the burden which would be assumed by nonsingle-family property owners." *Id.* Since the legislation had a rational basis and the taxpayer had not demonstrated any discrimination — as is the case with the legislation at issue in

the current appeal — the court upheld the constitutionality of the statute. *Id.* at 56-57; see also *United Illuminating Co. v. City of New Haven,* 427 A.2d 830, 840 (Conn. 1980) (tax phase-in statute and local ordinance implementing it did not violate Equal Protection Clause notwithstanding that phase-in acts resulted in continued temporary inequities that mandatory periodic revaluation and uniform assessment rate were designed to ameliorate).[7]

¶ 20. Here, the State argues that the freeze has a rational basis: ensuring temporary stability of tax revenues in a number of small Vermont towns, in the face of difficulties in determining the fair market value of hydroelectric facilities brought about by the "changing and deregulated utility market." 1999, No. 49, § 23(a), eff. June 2, 1999. We agree with the trial court that this purpose "is certainly legitimate and important, and is arguably compelling."

¶ 21. Probably because utility property tends to be unique, or close to it, and the methods for valuing it are complicated and frequently contested, see, e.g., *New England Power Co. v. Town of Barnet,* 134 Vt. 498, 367 A.2d 1363 (1976), we have a number of decisions involving the valuation of such property for property tax purposes. See, e.g., *Vermont Elec. Power Co. v. Town of Vernon,* 174 Vt. 471, 807 A.2d 430 (2002) (mem.); *Vermont Elec. Power Co. v. Town of Cavendish,* 158 Vt. 369, 611 A.2d 389 (1992). Indeed, our leading case, *Town of Barnet,* involved hydroelectric generation facilities on the Connecticut River, although different ones from those before us in this case. In that case, we described the valuation process:

> We do not here attempt to outline all the elements and appraisal approaches which may be utilized in arriving at fair market valuation. They are appropriate subjects for expert testimony to be properly evaluated by the trial court. The court has noted that the cost approach, the income approach, and the market data approach offer the parties means of determining fair market value. Original cost less depreciation may be a method of arriving at fair market value if it reflects present

[7] USGen attempts to distinguish the *Stafford Higgins* case on the grounds that the Connecticut statute provided a judicial remedy to the owner of any property who alleged that its out-of-state assessment was "manifestly excessive," *Stafford Higgins Indus.,* 715 A.2d at 49 n.5, whereas the freeze specifically denies hydroelectric facility owners a remedy. The statute cited by USGen was in fact not part of the challenged legislation, but rather was a general provision, equivalent to 32 V.S.A. § 4461, that provided for the appeal of a property valuation. To the extent that USGen claims that it has been denied a judicial remedy, we address that claim in ¶ 40 of this opinion.

costs. These original costs, however, must be trended, usually by some reliable index, so that they will in effect become present reproduction costs. Such costs less appropriate depreciation then become an element of valuation to be considered by the court in its appraisal.

The production capacity of the facility, as limited by size or applicable regulation, and the market value of the power it produces, would be limiting factors on valuation, since no one would buy or construct a facility whose product could not be sold at the price dictated by its cost. Similarly, if the site is unique and the demand for the power produced is high, the market value to a hypothetical buyer (hypothetical because of the monopoly enjoyed by the owner) might well be enhanced beyond reproduction costs. Distance from market, with resulting transmission costs, could also be a factor. So could the nature of the taxing community itself. A very rural, perhaps unorganized, community with few fiscal demands could be expected to produce lower tax demands than a more urban community. This could well affect fair market value.

There is no rigid formula which can be used to arrive at the correct valuation of NEPCO's property, situated as it is in two states and being a part of a large integrated system. Nor is specific weight required to be allocated to the several appraisal approaches or a combination of them which may be utilized in arriving at fair market value. Judgment is the keystone. If the court has considered and assigned such weight to each value indicator as appears to be fair, just and equitable according to the evidence presented, this Court will not disturb its conclusions on appeal absent errors of law.

*Town of Barnet*, 134 Vt. at 505-06, 367 A.2d at 1368 (internal citations omitted). As noted in that decision, the income-production of a hydroelectric facility will be extremely relevant, if not determinative, to its value. We have described income capitalization as "probably the most accurate way to establish value" of commercial properties at least in theory, but have also cautioned about the pitfalls and difficulties in this approach. See *Beach Properties, Inc. v. Town of Ferrisburg*, 161 Vt. 368, 372, 640 A.2d 50, 52 (1994).

¶ 22. Against this background, we consider the circumstances of this case. Although the record contains limited detail, a subject we address below, we understand that hydroelectric facilities of the size and location of those owned by USGen formerly operated under price regulation so

that their income was quite predictable. The price was deregulated so that the owners were free to sell the power on the market for the highest price available. Exactly what that price might be over the long term is apparently a subject of much debate among the experts in the field. It is possible that as a result of deregulation a hydroelectric facility became more or less valuable than it was under price regulation.

¶ 23. The large discrepancies in the several appraisals of the Bellows Falls facility mentioned above, see n.5, *supra*, demonstrates the uncertainty of the valuations of these plants following deregulation. Without the freeze, the small Vermont towns where such plants were located would have been forced to undertake a lengthy, expensive and unpredictable appraisal process, with a significant portion of their tax revenues at risk. Faced with revenue uncertainty, they could not effectively plan their budgets and set their tax rates. The freeze removed this instability by allowing towns ample time to accurately assess these properties and to plan for potential changes in valuations and any resulting budget impacts. As we found in *Alexander*, Vermont municipalities cannot be expected to reappraise all property in the town every year. 152 Vt. at 155, 565 A.2d at 1298. Thus, there was a rational basis for singling out hydroelectric plants for a temporary freeze in value in order to allow for a professional reappraisal of their value and protect tax revenues while that was occurring.

¶ 24. USGen contests the trial court's determination that the legislative purpose behind the freeze was to ensure budgetary stability in the face of an uncertain power market is undermined by the situations that the legislative acts specifically exempted from the freeze. As an example, USGen points to the exception for a town-wide reassessment and argues that such a reassessment does nothing to overcome the difficulties in evaluating a hydroelectric plant in a recently deregulated market.

¶ 25. A closer analysis of the three exceptions, however, reveals that they are entirely consistent with the legislative purpose found by the trial court. The first two exceptions — where a tax stabilization agreement existed that predated the legislation and where the owner of the hydroelectric facility entered into an agreement with the municipality not to reduce the grand list value — were allowed by the Legislature because such agreements avoid the complicated and uncertain reappraisals of the hydroelectric facilities and thus ensured budgetary stability. As for a town-wide reassessment, the legislative expectation was likely that such a comprehensive appraisal would be conducted not by volunteer listers, but instead by retained experts who would be capable of valuing the hydroelectric facilities along with other unique properties in the town. Moreover,

a comprehensive reappraisal allows the town to look at the tax burdens of all taxpayers and not just a few.

¶ 26. Under rational basis review, USGen has the burden of establishing that the freeze legislation "[cannot] be reconciled with any conceivable state of facts that might lend it rationality." *In re Property of One Church St.*, 152 Vt. 260, 270, 565 A.2d 1349, 1354 (1989); see also *Fed. Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 314-15 (1993) ("On rational-basis review, a [statutory] classification . . . comes to us bearing a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it.") (internal citations and quotation marks omitted). USGen has not carried its burden, and therefore we uphold the trial court's determination that the legislative acts enacting the freeze do not violate the Proportional Contribution Clause of the Vermont Constitution.

¶ 27. USGen argues that even if the freeze is valid under the Proportional Contribution Clause of the Vermont Constitution, it violates the Common Benefits Clause, Ch. I, Art. 7, under the standard recently approved in *Baker v. State*, 170 Vt. 194, 744 A.2d 864 (1999). Specifically, USGen argues that the failure to tax its property consistent with its fair market value does not bear "a reasonable and just relation" to a valid governmental purpose. *Id.* at 214, 744 A.2d at 879. We conclude that Article 7 does not apply to this dispute.

¶ 28. As we held in *Baker*, the Common Benefits Clause "is intended to insure that the benefits and protections conferred by the state are for the common benefit of the community and not for the advantage of persons 'who are a part only of that community.'" *Id.* at 212, 744 A.2d at 878 (quoting Vt. Const. Ch. I, Art. 7). The application of this standard in the context of property tax burdens is explained in *One Church St.*, 152 Vt. at 263-64, 565 A.2d at 1350-51, where a commercial building owner challenged a higher tax rate imposed by the City of Burlington on nonresidential property. We distinguished between the coverage of the Common Benefits and Proportional Contribution Clauses as follows:

> Though it may be an oversimplification, the goal of the Proportional Contribution Clause is protection of the individual from unfair government action, while the aim of the Common Benefit Clause is to protect the state from favoritism to individuals and to remind citizens of the sense of compact that lies at the heart of constitutional government.

*Id.* at 263, 565 A.2d at 1350. In response to plaintiff's argument, we then distinguished the situation in *State v. Ludlow Supermarkets, Inc.*, 141 Vt. 261, 448 A.2d 791 (1982), because in that case the Legislature had acted to create a special benefit of small businesses — the right to do business on Sunday — while excluding larger businesses:

> The amended Burlington Charter stands on a different footing. Though it creates classifications of taxpayers, its goal is to raise total City revenues and benefit the City's inhabitants as a whole. . . . It surely will benefit some taxpayers more than others, but "[s]o long as the public purpose is paramount and the enactment reasonably related to that purpose, the statute is not made invalid thereby." *Vermont Woolen Corp. v. Wackerman*, 122 Vt. 219, 226, 167 A.2d 533, 538 (1961).

*One Church St.*, 152 Vt. at 264-65, 565 A.2d at 1351.

¶ 29. Although we have occasionally decided taxpayer challenges under the Common Benefits Clause, in doing so we have never deviated from the rational basis standard we apply under the Proportional Contribution Clause. See, e.g., *Oxx v. Dep't of Taxes*, 159 Vt. 371, 376, 618 A.2d 1321, 1324 (1992) (statute requiring taxpayers to pay Vermont income tax on federal recapture of investment credit held unconstitutional as applied to taxpayers who had not derived a state income tax benefit from the investment credit); *State v. Harrington*, 68 Vt. 622, 629, 35 A. 515, 517 (1896) (Legislature may impose a license tax upon one occupation and not another, so long as there is no discrimination among those engaged in the occupation taxed). The reason for this approach is apparent. To the extent a taxpayer is claiming that government action imposes a higher burden on the taxpayer than others generally, this is exactly the type of challenge the Proportional Contribution Clause is intended to address. We would read this clause out of our constitution if we considered these challenges under the Common Benefits Clause using a more active standard of review.

¶ 30. The challenge here is of the type we refused to consider in *One Church Street* under the Common Benefits Clause. The purpose of the freeze is not to benefit a particular part of the community. Instead its purpose is to allow an opportunity for accurate appraisal of hydroelectric properties in light of fundamentally changing economic conditions and to maintain the revenue streams of towns hosting hydroelectric facilities while the reappraisal goes on. There is no "preferential benefit to any class of persons." 152 Vt. at 264, 565 A.2d at 1351. There is no violation of Article 7.

¶ 31. USGen also argues that the trial court, in arriving at what it believed to be the legislative purpose behind the freeze, engaged in legislative fact-finding that was improper on a motion for judgment on the pleadings since there was no record in the case to support the assertions made by the court. We note again in analyzing this argument that the trial court was not constrained by the facts presented by the parties when determining whether there is a rational basis behind a legislative act; instead, "we must look at any of the purposes that are conceivably behind the statute." *Smith v. Town of St. Johnsbury*, 150 Vt. 351, 357, 554 A.2d 233, 238 (1988).

¶ 32. Although the initial freeze provision did not contain a statement of intent, the extension provision, set out at the beginning of the opinion, did explain its purpose, and that explanation served as much of the basis for the court's decision. Moreover, many of the "facts" considered by the court — concerning deregulation, its destabilizing effect on the market for electric power, and the resulting uncertainty in the valuation of hydroelectric facilities — were put in front of the court by counsel for USGen in the process of trying to demonstrate that the fair market value of the Bellows Falls facility had decreased significantly from the $94,000,000 grand list value.[8] Thus, to the extent that USGen contributed to the court's fact-finding, it has waived its right to challenge the court's action on appeal.

¶ 33. For the reasons stated above, we reject the facial challenge to the constitutionality of the freeze legislation. We consider next USGen's argument that the legislation is unconstitutional as applied to it, or at least that the superior court erred in rejecting this challenge without factual development. USGen challenges the freeze in two respects: (1) USGen has been unconstitutionally singled out because only its hydroelectric plants were affected by the freeze and (2) because the legislative acts effecting the freeze contain no language specifying how the allocation of the frozen value between USGen and New England Power was to occur and USGen was not allowed to show fair market value of the frozen assets to determine their allocation, the listers were given unconstitutionally broad and standardless discretion in making such an allocation.

---

[8] During a December 17, 2000 status conference, counsel for USGen stated the following:

[A]s the Court may know from reading the papers, the price of energy is bouncing around quite a bit in the short-term. It's an issue that a lot of people disagree on and the question of how these plants generate and dispatch power and what the revenue that will be generated by that power is really the central one that everyone's got to deal with.

¶ 34. USGen's first "as applied" challenge is apparently based solely on its claim that only its hydroelectric generating facilities were frozen in value as a result of the legislation. This challenge was not specifically set out in USGen's complaint. Although USGen has reiterated this claim on a number of occasions in the trial court and in this Court, it has not explained why that fact is significant. Moreover, it has not contested the purpose of the freeze legislation as contained in the extension provision, and, in fact, has explained its purpose in similar terms. Thus we fail to see how this fact alone changes our constitutional analysis.

¶ 35. USGen's second "as applied" challenge is centrally linked to the decision of the superior court to restrict the evidence USGen could offer to determine the allocation of the value of the frozen assets between it and New England Power. USGen has been somewhat schizophrenic about this decision. On the one hand, it has criticized it as wrong. On the other hand, it has not challenged it directly. Instead, it has relied upon the decision as showing that the freeze statute is irrational and that the allocation process is standardless. Although the evidentiary decision cannot now be reviewed directly because USGen has stipulated to an allocation for 1999, we address it because of its relationship to the constitutional challenges.

¶ 36. Following its decision dismissing the constitutional claims based on USGen's complaint, the court ruled that it would take evidence on the allocation of the frozen value between USGen and New England Power. The court ruled on what type of evidence that it would accept:

> With respect to the issue of allocation of the grand list value between USGen and [New England Power], the parties should present evidence about the allocation of property rights between USGen and [New England Power], as well as about how the Towns have already allocated the grand list values between USGen and [New England Power] in their listings for fiscal year 1999-2000, what those allocations were based on, and why they are or are not accurate. Again, no revaluation of the power plants on April 1, 1999 is necessary.

The court rejected USGen's subsequent request to be allowed to present expert testimony on fair market value as of April 1, 1999 for the purposes of allocating the grand list value, stating that "the Legislature has clearly precluded litigation of just this issue [i.e. the fair market value of the frozen assets]" and that "[t]o the extent the proportional division is subject to dispute, evidence as to the structure of the agreements between USGen and [New England Power], together with the represen-

tations made to the municipalities and the State, ought to be determinative."[9]

¶ 37. As USGen points out, nothing in the freeze legislation purports to deal with the allocation issue. Nor is it necessary to hold that the allocation was frozen along with the grand list value in order to make the freeze legislation effective. See *Elkins v. Microsoft Corp.*, 174 Vt. 328, 331, 817 A.2d 9, 13 (2002) ("In general, we will not read provisions into the statute that are not present unless it is necessary in order to make the statute effective."). The legislative purpose of the legislation is to protect the Town of Rockingham from premature litigation of fair market value for purposes of determining the assessed value. There is no similar concern about USGen and New England Power using evidence of fair market value to determine the allocation of the frozen value between them. Such evidence would not bind the Town except to implement the allocation that the court determined. See *Trepanier v. Getting Organized, Inc.*, 155 Vt. 259, 265, 583 A.2d 583, 587 (1990) (collateral estoppel does not apply if party to be estopped does not have "full and fair opportunity" to litigate the issue in the earlier proceeding). Of course, the court could have decided that the evidence of fair market value was not determinative, but it was clearly relevant to the allocation question. See V.R.E. 402 (all relevant evidence is admissible, except, inter alia, as otherwise provided by the rules of evidence). The court erred in excluding it.

¶ 38. We now turn to USGen's constitutional arguments and note at the outset that its argument has changed somewhat from that presented to the superior court. Its argument to that court was that the court had to determine the fair market value of USGen's hydroelectric assets in order to allocate the frozen value between it and New England Power, which had retained some hydroelectric assets subject to the freeze. Since fair market value had to be determined for allocation purposes, it argued that the legislative purpose of preventing valuation based on current fair

---

[9] The court also based its denial of USGen's request on its conclusion that USGen had "failed to satisfy the requirements of V.R.[E.] 103(a)(2) as respects a true offer of proof, due to insufficient specificity regarding the expert testimony to be proffered." An offer of proof must be specific and concrete, showing what evidence will be introduced, the particular circumstances covered, and the purpose of the offer. *R.E. Bean Constr. Co. v. Middlebury Assocs.*, 142 Vt. 1, 7, 451 A.2d 1096, 1100 (1982). We agree with the trial court that USGen's offer of proof did not sufficiently specify the names of the expert witnesses that would be testifying and exactly what these witnesses would be testifying to. See *id.* (offer of proof generally requires that witnesses' names and addresses be given). It is clear, however, that this deficiency was not the reason for the trial court's ruling. Reaffirming its original ruling on the motion to dismiss, the court would not allow any expert testimony on fair market value of the property on April 1, 1999.

market value was so undermined that the freeze did not meet the rational basis test. As we discussed above, we agree that USGen should have been allowed to introduce the fair market value evidence, but this does not affect our conclusion on the constitutionality of the freeze legislation. In making its argument, USGen has assumed that if it has the opportunity to present evidence on fair market value, the proven fair market value will become binding on the Town of Rockingham and determine the assessment of the hydroelectric facilities in the future. As we held above, this assumption is erroneous, and the full purpose of the freeze legislation can be implemented despite the admission of the fair market value evidence. We reject the argument that the freeze legislation is unconstitutional "as applied" because of the introduction of the fair market value evidence.

¶ 39. Because the court excluded the fair market value evidence, US-Gen has raised the new constitutional argument here that the statutory scheme is invalid because it contains no standard to determine the allocation of the value of the frozen assets. See *In re Handy*, 171 Vt. 336, 346, 764 A.2d 1226, 1235-36 (2000). This argument was not raised below, and we are not required to consider it. See *State v. Ben-Mont Corp.*, 163 Vt. 53, 61, 652 A.2d 1004, 1009 (1994) (to properly "preserve an issue for appeal a party must present the issue with specificity and clarity in a manner which gives the trial court a fair opportunity to rule on it"). In any event, it is based on the incorrect assumption that USGen cannot show the true value of the frozen assets in order to allocate their frozen value between it and New England Power. The standards applicable to the allocation question are those applicable in any property valuation proceeding. The freeze legislation is not unconstitutional as applied.

¶ 40. USGen's final constitutional challenge is that the freeze legislation violates USGen's right to a remedy under Chapter I, Article 4 of the Vermont Constitution by barring judicial review of appraisal value for three years. We disagree. Chapter I, Article 4, which provides that "[e]very person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which one may receive in person, property or character," ensures that Vermonters have access to the judicial process. *Shields v. Gerhart*, 163 Vt. 219, 223, 658 A.2d 924, 928 (1995). Contrary to USGen's protestations, the freeze did not affect USGen's access to the judicial process: its right to bring a tax appeal pursuant to 32 V.S.A. § 4461 — a right which USGen exercised and the exercise of which led to the current appeal — was left undisturbed by the legislative acts. In determining the appeal, § 4467 requires the court to "take into account the requirements of law as to valuation,

and the provisions of Chapter I, Article 9 of the Constitution of Vermont and the 14th Amendment to the Constitution of the United States." We recognize that the freeze narrowed the issues in the appeal by establishing a different "law as to valuation" than is applicable for other property, but this was a change in the substantive law of valuation of taxable property and not a restriction on USGen's appeal rights. Further, USGen is free in its appeal to the court to challenge the constitutionality of the "law as to valuation" as it did here. Nothing in Chapter I, Article 4, however, guarantees that such a challenge must succeed. See *Shields*, 163 Vt. at 223, 658 A.2d at 928 (Chapter I, Article 4 ensures access to judicial process but does not create substantive rights).

*Affirmed.*

¶ 41. **Johnson, J.,** concurring. There is wisdom in the rule that a court should be "quite certain of its ground before making a categorical finding that there is no permissible objective served by a state statute or that there is utterly no sensible or discernible relation between the legislature's classification and a legitimate end." *In re Paris Air Crash*, 622 F.2d 1315, 1319 (9th Cir. 1980). The difficulty here, in my view, is that while the hydroelectric "freeze" legislation in question may serve a permissible governmental purpose, it is not the one stated by the Legislature. The relation between the law and the express legislative purpose is weak, at best, and the disconnect between ends and means would thus normally provide a basis to invalidate the legislation as arbitrary and capricious. Nevertheless, because the statute appears to serve a reasonable and legitimate, if unstated, governmental goal, I concur in the judgment.

¶ 42. This and other courts have consistently upheld the power of the state to divide different kinds of property into classes and assign them different tax burdens so long as the divisions and classifications are neither arbitrary nor capricious. See, e.g., *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) ("[I]n structuring internal taxation schemes the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.") (internal quotations omitted); *In re Property of One Church St.*, 152 Vt. 260, 262, 565 A.2d 1349, 1350 (1989) (Vermont Constitution "does not prohibit taxes that distinguish among classes of taxpayers," thus upholding nonresidential property tax at 120% of fair market value). To withstand constitutional review under our Proportional Contribution Clause, Vt. Const., Ch. I, Art. 9, we have established only two basic requirements: "first, that any legislative classification of taxpayers bear a reasonable relation to the

purpose for which it is established; and second, that the classification scheme be fairly and equitably applied among like classes of taxpayers." *One Church St.*, 152 Vt. at 266, 565 A.2d at 1352.

¶ 43. The first task, therefore, is to discern the purpose of the legislation. In making this determination, we are naturally inclined to credit the Legislature's own declaration of intent, if one is available. See, e.g., *Anderson v. State*, 168 Vt. 641, 642, 723 A.2d 1147, 1148 (1998) (mem.) (referring to statement of legislative purpose underlying Act 60); *Estate of Frant v. Haystack Group, Inc.*, 162 Vt. 11, 14, 641 A.2d 765, 767 (1994) (relying on Legislature's "avowed purpose for the statute" in construing intent underlying acceptance-of-risk statute, 12 V.S.A. § 1037). A legislative declaration of purpose does not, however, command automatic acceptance. See *Jarvis v. Cory*, 620 P.2d 598, 602 (Cal. 1980) ("where a declaration is in irremediable conflict with a statute's substantive provisions, courts will not blindly bow to the Legislature's stated interpretation"). Indeed, that is the case here; all deference to the Legislature notwithstanding, it is difficult to reconcile the freeze statute's substantive provisions with its stated goals.

¶ 44. As the Court notes, the 1999 act that extended the freeze on grand list values of hydroelectric generating facilities stated that its goals were to provide additional time for towns to accurately determine fair market value in the recently deregulated market; to allow for greater assistance from the Department of Taxes; to permit expert independent appraisals; and to facilitate negotiations regarding the determination of fair market value. 1999, No. 49, § 23(a), eff. June 2, 1999. In apparent reliance on this statement of purpose, the trial court here found that the primary purpose of the act was to provide a measure of budgetary predictability in a potentially volatile deregulated market, to allow towns to engage in budgetary planning without having to wait for completion of the difficult utility-reappraisal process. Tellingly, however, the act also exempted hydroelectric facilities in situations where a tax stabilization agreement predated the legislation; the facility entered into an agreement with the municipality not to reduce the grand list value; or the municipality completed a reappraisal of all taxable real estate after April 1, 1997.

¶ 45. Although the goal expressed by the Legislature is to ensure budgetary predictability in an uncertain utility market, the act's exemptions suggest that its purpose is actually to prevent any reductions in the assessed value of hydroelectric facilities for the period of the freeze, to allow market values to catch-up with grand list values in the event of any short-term market depression. Surely if the primary goal was budgetary

predictability the act would have exempted any stipulated hydroelectric grand list value instead of only those agreements not to reduce value. Similarly, the challenge of appraising a hydroelectric facility that sells below grand-list value during the freeze period would not seem any greater than appraising a hydroelectric facility as part of an overall townwide reassessment, yet only the latter is exempted from the freeze, again suggesting an underlying intent to prevent any reduction in grand list value.

¶ 46. While the law on its face thus exhibits a rather tenuous connection with its stated objective, a reviewing court's inquiry is necessarily directed "toward the nexus between a classification and such purposes as it may serve.... Thus, if any reasonable policy or purpose for the legislative classification may be conceived of, the enactment will be upheld." *Andrews v. Lathrop*, 132 Vt. 256, 259, 315 A.2d 860, 862 (1974) (quoted with approval in *One Church St.*, 152 Vt. at 266, 565 A.2d at 1352). A legislative effort to temporarily peg hydroelectric grand list values at previously assessed levels to avoid short-term reductions is little different, in effect, from assigning a hydroelectric facility a higher tax rate or, as in *One Church Street*, an artificially inflated fair market value to raise municipal revenue and benefit the municipal inhabitants as a whole. *One Church St.*, 152 Vt. at 264, 565 A.2d at 1351. As noted, courts have long upheld the validity of laws singling out certain industries for differential tax treatment so long as the classifications have a reasonable basis. See, e.g., *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 109, 123 S. Ct. 2156, 2160 (2003) (upholding Iowa law that imposed maximum tax rate of 36% on racetrack slot machines but only 20% on riverboat slot machines as rationally related to legitimate purpose of "aiding the financial position of the riverboats"); *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 526-27 (1959) ("The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products."); *Blue Cross & Blue Shield v. State*, 779 P.2d 634, 642-43 (Utah 1989) (upholding against equal protection challenge state law that exempted insurance companies organized as mutual benefit corporations from taxes on subscription and premium income imposed on all other insurance companies).

¶ 47. My point is that when the Legislature makes such a policy choice, it has the responsibility to confront that choice directly rather than mask it in reasons that do not withstand scrutiny. As the goal of maintaining municipal tax revenue by freezing the grand list values of hydroelectric generating facilities is consistent with the Legislature's taxing authority, and the classification appears to be reasonable and uniformly applied, I

discern no constitutional infirmity in the law. Therefore, I concur in the judgment, but I do so on the real legislative policies underlying the statute.