Lesage v. Town of Colchester, No. S1417-03 CnC  (Norton, J., Feb. 17, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                           SUPERIOR COURT
Chittenden County, ss.:                            Docket No. S1417-03 CnC

PETER LESAGE AND STEPHANIE LESAGE

v.

TOWN OF COLCHESTER

ENTRY

This matter came before the court in a hearing on January 6, 2005, regarding the Lesages' appeal of the Colchester Board of Civil Authority's valuation of their lake cottage. Applying a de novo standard of review, 32 V.S.A. § 4467, the court makes the following findings of fact and conclusions of law.

Findings of Fact

In 1988 the appellants Peter and Stephanie Lesage, husband and wife, purchased a cottage on the shore of Lake Champlain in the Mallets Bay area, in the Town of Colchester. They paid $35,000 for the cottage only, since the land was owned by Willie and Alice Allard from 1974 to 2000. Alice was aunt to Peter Lesage and his cousin Jerome Lesage, the owner of the lot now and at the time of the Town's valuation under appeal, April 1, 2003. The cottage and lot are referred to on the Colchester residential property list as 01235 East Lake Shore Drive, formerly known as 38 Lakeshore Drive.

Mark E. Paulson has been assessor for the Town of Colchester since 1991, with extensive experience in private and municipal appraisal, summarized in Exhibit A. The court finds him to be a credible and persuasive witness. He was the only expert to testify

in this case. His research shows the cottage was built in 1944 and is a two-level structure with five rooms and three bedrooms. Since 1944, this cottage is similar to about 300 seasonal cottages along Lake Champlain in Colchester, sharing the common characteristic of ownership of structure upon leased land. So when the Lesages bought it in 1988, their deed included any leasehold interest the grantor had in the land, and they agreed on a ten-year lease with the Allards to occupy the land under and around the cottage. The Lesages provided the assessor with an unsigned copy of the lease starting June 30, 1988. Peter Lesage told Paulson the rent was $425 a year, with yearly increments resulting in $600 in the end. When Jerome Lesage purchased the lot of land with five leased cottages from his Aunt Alice in September 2000, the transfer was subject to certain unrecorded leases, including "lease by and between Alice E. Allard and Peter F. Lesage and Stephanie Lesage."

Upon learning of the transfer, Paulson was advised by Jerome that he intended to provide written leases for the five lots. As part of a full town appraisal, the value of all properties at 100 percent of fair market value was set on April 1, 2003, the valuation date in this case. The Town listed the value of the cottage at $80,200, with $60,200 valuation for the cottage and improvements thereof, and $20,000 valuation assigned to the leasehold interest. The Lesages appealed to the Colchester Board of Listers, which left the value unchanged, but the Colchester Board of Civil Authority allowed a reduction of $20,000, the leasehold value. This appeal challenges the $60,200 valuation by the BCA, essentially arguing that the lack of a written lease rendered their cottage unmarketable in all three forums. In this de novo appeal, Peter Lesage testified the cottage was of nominal value because he had no permanent right to stay there.

Because this is a de novo appeal, neither the Town nor the Lesages are bound by the evidence presented to the Listers or the BCA. In re Milot, 151 Vt. 615, 617 (1989).

Jerome Lesage did not testify in this appeal. Paulson requested a copy from Jerome of the lease and received an unsigned proposal between Jerome and the Lesages, admitted into evidence as Exhibit J. It called for rent spelled out as "One Thousand Three Hundred Dollars" but followed by "$1400.00" numerically. Other than this obvious error, it called for a term of five years commencing July 1, 2004, through May 31, 2009, with a right to renew for five years. The lease appears to the court as a standard ground lease, but the Lesages in their requests to find deemed the lease "unintelligible" pretrial and

"internally inconsistent, wrong in some respects and incomplete in others" post-trial. Peter Lesage said he had his counsel redraft the proposal, but it was not clear if Jerome ever received a revision or rejected it. In any event, no signed lease was introduced covering the appellants' ownership of the seasonal cottage acquired in 1988.

The lack of a written lease was contrary to the general protocol one might reasonably expect that a buyer of a cottage on leased land would reach a lease agreement prior to purchasing. Research by Paulson divulged about 300 structures in Colchester owned separately from the leased land on which they were situated, including seasonal and year-round residences. A survey of the six largest properties similarly situated found the proposed Lesage lease to be in conformity with the Colchester leases in terms and rent. For example, the typical lease for cottages on the shore of Lake Champlain called for rent ranging from $1,400 to more than $5,000. (The survey included the land owners of the seven properties used in the comparative market sales analysis to determine fair market value of the Lesage cottage by Paulson, discussed below.)

In setting the grand list for April 1, 2003, the valuation date for this appeal, Colchester relied on a town-wide reappraisal by contracted appraisers who analyzed two years of property sales in creating a computerized model for valuation of all properties, including cottages on leased land. This de novo trial, which centered on the issue of the effect of a lease or a cottage without a lease, called for a more "precise" or focused approach by Paulson. While using the recognized method of determining the fair market value by comparable sales of cottages on leased land, Paulson first had to determine the value of the leasehold interest by the residual technique, wherein he examined arm's-length transfers for two years prior to April 1, 2003. First, for each sale he determined the value of improvements to the property, using the accepted cost and appreciation method derived from local market data, which when subtracted from the selling price left a remainder representing the value of the leasehold interest. Based on this residual method, Paulson testified the leasehold interest of lots along the shores of the lake ranged from $20,000 to $60,000.

To determine the fair market value of the Lesage cottage, Paulson further narrowed the scope of his analysis to sales of seven arm's-length properties with three common elements: seasonal cottages on leased land located on the shore of Lake Champlain. All of the sales occurred within about a year of April 1, 2003, and in the opinion of the assessor, were most comparable to the cottage under appeal. (See Exhibit

L, Seasonal Property Sales on Leased Land.) He also considered the total living area and physical condition of the cottages, and the value of the assessed leaseholds ranged from $35,000 to $60,000, averaging out at $46,000. Since the date of sale ranged from October 2002 to May 2004, he analyzed 32 properties that sold and were then resold between January 2002 and July 2004, and found the annual rate of change to be 14 percent. He used that factor to adjust the price to April 1, 2003, on the seven comparables and determined the average to be $121,100. Thus, the assessor rendered the opinion that the fair market value of the cottage under appeal was the remainder of subtracting the comparables' average leasehold interest $46,000 from the average time-adjusted selling price $121,100, or $74,700, which Paulson rounded off to $75,000. The court finds this valuation based on acceptable valuation methods recognized by our courts to be the fair market value of the Lesage cottage as of April 1, 2003.

## Conclusions of Law

The Lesages attack the Town's appraisal on two grounds. First, they argue that the cottage has minimal value because they lack a lease with the owners of the underlying land. Without such a lease, the Lesages claim, the court must consider the cost of moving the cottage in deriving a fair market value. Second, the Lesages argue that the appraisal violated the appraisal statute, 32 V.S.A. §§ 3481–3482, 4041, as well as the Vermont and U.S. constitutions, because it incorporated a different methodology from the appraisals of other property in Colchester. In particular, the appraisal included property valuation data obtained after the statutory-mandated April 1, 2003 listing date.

The court begins with the standard for "appraisal value" in the property taxation statute. Section 3481(1) of Title 32 provides that

> "[a]ppraisal value" shall mean . . . the estimated fair market value. The estimated fair market value of a property is the price which the property will bring in the market when offered for sale and puchased by another, taking into consideration all the elements of the availability of the property, its use both potential and prospective, any functional deficiencies, and all other elements such as age and condition which combine to give property a market value.

As the statute demonstrates, the inquiry into fair market value is a broad one, and considerations cannot be limited to single factors. "While the most persuasive method of appraising residential property in Vermont is to establish fair market value through bona

4

fide sale transactions, our statute does not prescribe the method nor limit the manner in which evidence of fair market value may be presented . . . ." Sondergeld v. Town of Hubbardton, 150 Vt. 565, 567 (1988) (citation omitted). "Generally, there is no one controlling element or factor" in determining fair market value. In re Heath, 128 Vt. 519, 524 (1970). The fair market value, however, reflects "the highest and best use," which "has generally been construed to refer to 'the value of the property for its most profitable, likely, and legal use.'" Scott Constr., Inc. v. Newport Bd. of Civil Auth., 165 Vt. 232, 235 (1996) (quoting D. Stockford, Property Tax Assessment of Conservation Easements, 17 B.C. Envtl. Aff. L. Rev. 823, 827 (1990)).

On an appeal, the taxing authority bears the initial burden of producing evidence of valuation. Once the authority has met this burden, "the taxpayer retains the burden of persuasion as to contested issues . . . . To prevail a taxpayer must show an arbitrary or unlawful valuation." Sondergeld, 150 Vt. at 568. The ultimate value need only fall with a "range of rationality." Breault v. Town of Jericho, 155 Vt. 565, 569 (1991).

Here, the Lesages' argument essentially boils down to one of form over substance. Although legal form is often dispositive in determining tax liability, see, e.g., Sherburne Corp. v. Town of Sherburne, 145 Vt. 581, 585 (1985) (holding property tax-exempt because of state's legal title, despite corporation's lease and long-term use of and benefit from property), Vermont law also disregards legal form in other instances, see, e.g., 32 V.S.A. § 3610(e) (providing for listing of property under perpetual lease as real estate of lessee, despite lessor's title to property). The Lesages' lack of a written lease may be an "element" in determining fair market value, but it depends on the specific facts of this case. The court could conceive of a situation where the owner of the land under a cottage such as the Lesages' actually restricted access to the cottage or otherwise burdened the cottage owners' use and benefit of the cottage. But the Lesages have presented no evidence that that is the case here. Rather, they simply argue that there is no formal written lease, even though they apparently continue to use the cottage in the same manner since purchasing the cottage in 1988. The lack of a lease is therefore not a relevant consideration in determining the fair market value in accordance with the cottage's most profitable, likely, and legal use by the Lesages, which they owned and occupied as of the valuation date, April 1, 2003.

5

Moreover, allowing a cottage owner to negate the entire value of a fixture merely by showing the lack of a lease could seriously erode a town's ability to collect property taxes. The court can foresee taxpayers deliberately acquiring cottages without written leases to avoid taxation.

At least one other court addressing these circumstances has reached a similar conclusion. See Cove Sportsmans Club v. Dept. of Revenue, 11 Or. Tax 40, 40–42 (Or. T.C. 1988). In that case, the plaintiffs owned buildings that occupied land owned by other entities under short term agreements. The plaintiffs used their buildings under this arrangement for decades. But they argued that the value of the buildings should take into account the cost of moving them because under the agreements, they might have to move the buildings at any time. The plaintiffs presented no evidence that they had to move the buildings, though. The court held that the plaintiffs' buildings should be appraised at their full value.

> Plaintiffs must pay tax on the full value of the buildings because they have full use of them. . . . By constructing buildings on land in which they hold only a short-term interest, plaintiffs have created a situation where much of the building value contingently resides with the owner of the land. That is, the land owners can affect the value of plaintiffs' interests in the buildings by terminating plaintiffs' rights to use the land. However, this does not diminish the value of the buildings for ad valorem tax purposes. It is merely necessary to recognize that some of the value contingently resides with the owners of the land. Until such time as the owners of the land take action to terminate plaintiffs' use of the land, all of the building value is assessable to the owners of the buildings.

Id. at 42–43. Although the Oregon Tax Court applied appraisal statutes that differ from Vermont's, see id. at 41–42, the court's reasoning is persuasive. Accordingly, the court does not find that diminishing the appraisal value because of the lack of a lease is appropriate here.

Turning to the Lesages' methodology argument, the Lesages argue: (1) that the use of market data obtained after the listing date of April 1, 2005, violated the property tax statute, and (2) that the use of such data violates constitutional requirements of uniformity in property valuation under chapter I, article 9 of the Vermont Constitution

6

(the proportional contribution clause) and under the equal protection clause of the Fourteenth Amendment to the U.S. Constitution.[1]

The Lesages' statutory argument is unavailing. The statutory listing date merely requires the tax assessor to list the property at its value as of April 1. 32 V.S.A. § 3482. The use of valuation data after April 1 does not necessarily mean that the assessor in this case obtained a value different from the value as of April 1. The assessor specifically adjusted the sales data to adjust for the annual rate of change for those sales that occurred after April 1. Moreover, the Vermont Supreme Court has stated that

> "[t]here is no statute which requires that property within a municipality shall be appraised uniformly for tax purposes. The only requirement . . . is that the listers shall appraise . . . property at its fair market value." Where the Legislature has tacitly accepted that listing below 100% of fair market value will go on, the obligation to appraise at fair market value does not equal an obligation to appraise uniformly.

Alexander v. Town of Barton, 152 Vt. 148, 156 (1989) (quoting In re Town of Essex, 125 Vt. 170, 172 (1965)) (alteration in original). The Town's obligation here was to provide an appraisal at fair market value, not to provide an appraisal under an entirely uniform methodology. The Town's appraisal complied with its statutory obligations, and the Town is not bound by earlier appraisals in this de novo appeal.

In the taxation context, the two constitutional provisions on which the Lesages rely share the same standard, which is a rational basis standard of review. See id. at 157. "'Under this test, distinctions will be found unconstitutional only if similar persons are treated differently on "wholly arbitrary and capricious grounds." If there is a rational basis for the distinctions, serving a legitimate policy objective, there is no equal protection violation.'" Id. (quoting Smith v. Town of St. Johnsbury, 150 Vt. 351, 357 (1988) (citations omitted)). The Lesages bear the burden of demonstrating that the appraisal method "'[cannot] be reconciled with any conceivable state of facts that might

---

[1] The Lesages also argue that the assessor's actions violate the Common Benefits Clause of the Vermont Constitution. Vt. Const. ch. I, art. 7. This clause addresses distribution of benefits, not the distribution of burdens, such as paying taxes. See USGen New England, Inc. v. Town of Rockingham, 176 Vt. 104, 117 (2003). The clause is therefore inapplicable here.

7

lend it rationality.'" <u>USGen New England</u>, 176 Vt. at 116 (quoting <u>In re Property of One Church St.</u>, 152 Vt. 260, 270 (1989)) (alteration in original).

Here, the Lesages have failed to meet their burden. The Town's assessor explained that the unique circumstances of the Lesages' property arrangement required a more "focused" approach in ascertaining fair market value. Accordingly, the assessor had to parse out the leasehold interest value from the Lesages' property in order to determine the value of the cottage alone. This involved an approach different from the computer modeling approach that the Town used in its town-wide reappraisal. The assessor's approach was rational under these circumstances, and the Lesages have failed to demonstrate that it was "wholly arbitrary or capricious." Therefore, the Lesages' constitutional argument fails.

Have considered and rejected the Lesages' arguments, the court finds that the Town's appraisal was supported by the evidence and was reasonable. The fair market value of the Lesages' property is therefore $75,000.

SO ORDERED.


Dated at Burlington, Vermont, February 17, 2005.


_____/s/_____
Richard W. Norton     Judge

8